IN THE MATTER OF: THE APPEAL OF WILLIAM H. McELWEE, JR., WILLIAM H. McELWEE, III, ELIZABETH McELWEE CANNON, DOROTHY PLONK McELWEE AND JOHN PLONK McELWEE; R. B. JOHNSTON AND SONS; AND PAUL OSBORNE AND PRESLEY E. BROWN LUMBER COMPANY FROM THE VALUATION OF CERTAIN OF THEIR PROPERTIES BY WILKES COUNTY FOR 1977

No. 118

(Filed 6 October 1981)

1. **Taxation § 25.11 — appeals from the Property Tax Commission**
    G.S. 105-345.2 is the controlling judicial review statute for appeals from the Property Tax Commission.

2. **Taxation § 25.4 — ad valorem taxation — schedule of values — insufficient notice**
    Notice of the 1977 schedules of values used by Wilkes County in appraising property for ad valorem property tax purposes was found insufficient to fulfill the due process requirement and to bar an attack against the revaluation schedules themselves where a public newspaper of general circulation in Wilkes County printed a notice pertaining to the revaluation only once, it was printed in the smallest possible print, was buried in a page containing two

9. Bouhuys, Schoenberg, Beck and Schilling, op. cit., *supra* n. 1. *See also* 1B Larson, *supra*, § 41.64(b), n. 83.1.

In re McElwee

large pictures taken at a football game, three general news articles, a notice of public hearing and an advertisement for a local drive-in theater, and was printed some twenty-seven months before the effective date of the revaluation. Therefore, the actions of the Property Tax Commission in affirming the procedure employed by Wilkes County was in violation of constitutional provisions and made upon unlawful proceedings within the meaning of G.S. 105-345.2(b)(1) and (3).

**3. Taxation § 25.4— ad valorem taxation—on-site visits of property**

All property being reappraised by a county must receive an on-site visit and observation by the appraiser; therefore, where the record in an appeal by taxpayers concerning the revaluation of property in Wilkes County in 1977 indicated on-site visits of all the property in Wilkes County could not have been made, the revaluation of taxpayer's properties was illegally done by virtue of the county's failure to comply with G.S. 105-317(b)(2).

**4. Taxation § 25.4— county wide reappraisal of property—arbitrariness**

A decision to conduct a county wide reappraisal of property in a time of less than two months, and to complete it some twenty-seven months prior to its effective date, does not comport with the realities of the economic world and is plainly arbitrary under G.S. 105-317.

**5. Taxation § 25.4— ad valorem taxation—rebuttal of regularity—burden upon county**

When a taxpayer has rebutted the presumption of regularity in property valuation in favor of the county, the burden then shifts to the county to demonstrate to the Property Tax Commission that the values determined in the revaluation process were not substantially higher than that called for by the statutory formula, and the county must demonstrate the reasonableness of its valuation "by competent, material and substantial evidence." G.S. § 105-345.2(b)(5).

**6. Taxation § 25.4— ad valorem taxation—use of comparable sales to establish present use valuation improper**

In order for a county to use sales of similarly used lands in establishing present use valuation, the county must demonstrate that the buyers and sellers involved in the comparable sales transactions had knowledge of the property's capability to produce income in its present use, that the present use is the highest and best use and that the purchaser intended to continue to use the property in its present use.

**7. Taxation §§ 25.4; 25.11— findings of Property Tax Commission—not supported by evidence**

In a suit by landowners questioning the procedures used by Wilkes County authorities for establishing present use values for agricultural, horticultural, and forest land for ad valorem property tax purposes, the findings and conclusions of the Property Tax Commission were found to be without support by competent, material and substantial evidence in view of the entire record as all evidence with respect to comparable sales was irrelevant and other testimony in support of the valuation was improperly based upon market value sales.

ON appeal as a matter of right pursuant to G.S. 7A-30(2) from the decision of the Court of Appeals, 51 N.C. App. 163, 275 S.E. 2d 865 (1981), one judge dissenting, affirming a final decision of the North Carolina Property Tax Commission, sitting as the State Board of Equalization and Review, entered 26 October 1979.

On this appeal we consider the statutory procedures for establishing present use values for agricultural, horticultural and forest lands for ad valorem property tax purposes.

*McElwee, Hall, McElwee & Cannon, by W. H. McElwee, William H. McElwee III, and William C. Warden, Jr., for appellants.*

*Brewer and Freeman, by Joe O. Brewer and Paul W. Freeman, Jr., for appellee Wilkes County.*

This case was argued as No. 134 at the Spring Term 1981.


CARLTON, Justice.

The issue on this appeal is whether the governing officials of Wilkes County followed prescribed statutory procedures in establishing a present use value schedule for 1977, a revaluation year, which was used by the county in establishing a valuation for ad valorem property tax purposes on forest lands owned by appellants.

I.

In the summer of 1974 the Wilkes County Board of Commissioners contracted with Allen Appraisal Company for a reappraisal of all real property in the county as required by G.S. 105-286, the reappraisal to become effective 1 January 1977. Over a period of seven or eight weeks Allen developed schedules of values to be used in appraising individual properties. The schedules were approved and adopted by the Board of Commissioners on 24 September 1974. The schedules adopted included a document entitled "1977 Use Value Schedule for Wilkes County." This schedule appears in the record as follows:

1977

USE VALUE SCHEDULE FOR WILKES COUNTY

Agricultural and Horticultural Land

| Soil Classification | | | Use Value |
|---|---|---|---|
| I | Good | (+) | $500/ac |
| | Good | | 450/ac |
| | Good | (−) | 400/ac |
| II | Fair | (+) | $350/ac |
| | Fair | | 300/ac |
| | Fair | (−) | 250/ac |
| III | Poor | (+) | $200/ac |
| | Poor | | 150/ac |
| | Poor | (−)  (Waste-land) | 50/ac |

Orchard

Classification

| A | Class | $800/ac |
|---|---|---|
| B | Class | 600/ac |
| C | Class | 400/ac |
| D | Class | 200/ac |

Forest

Classification

| I | Good | | $300/ac |
|---|---|---|---|
| | Fair | | 200/ac |
| | Poor | | 100/ac |
| | Poor | (−)  (Waste-land or non-productive land) | 50/ac |

All land will be classified according to the productivity of crops normally grown

EXAMPLE

| Crop | Land | Yield | Net Income | Cat-Rate (sic) | Use Value |
|---|---|---|---|---|---|
| Corn | Good + | 100 bu | $40.00 | 8% | $500/ac |

In re McElwee

This schedule was used for the determination of present use valuations for the property which is the subject matter of this appeal.

On 26 September 1974, *The Journal-Patriot*, a public newspaper of general circulation in Wilkes County, printed a notice pertaining to the revaluation. No other public notice appeared with reference to the adoption of schedules, standards and rules for the 1 January 1977 revaluation of Wilkes County property. The only reference to the schedules, standards and rules adopted by the County Commissioners relating to the reappraisal of real property in Wilkes County was a short statement which appeared in the minutes of the Commissioners in minutes dated 24 September 1974.

Appellants owned approximately 22,584 acres of forestland in Wilkes County in 1977 and appealed its valuation. On 31 March 1977 each of the appellants made proper application for present use valuation as provided in G.S. 105-277.4 (1979). Wilkes County valued the appellants' property at $100 per acre according to the schedule set out above. The parties stipulated that Wilkes County's use value assessment and its market value assessment of the property are the same. Thereafter, each of the appellants filed with Wilkes County a complaint regarding the valuation of their respective properties. The matter came on for hearing before the Wilkes County Board of Equalization and Review and, in each instance, that Board ruled on each appellant's complaint as follows:

(1) The above-mentioned land was appraised as timber land only.

(2) It was appraised at the lowest value on our schedule.

(3) This schedule was adopted as required by North Carolina state law before the appraisal work began in 1974.

(4) The use value schedule was duly adopted by the Wilkes County Board of County Commissioners and that this Board sitting as a Board of Equalization and Review has no authority to change this schedule of values. The Board can only change the application or misapplication as applied by the appraising officials.

(5) Based on the above facts the Board ruled no change in value.

As a result of these rulings, appellants made application to the North Carolina Property Tax Commission on 14 July 1977. That Commission, sitting as the State Board of Equalization and Review, conducted a hearing on 11 June 1979 and entered a final decision affirming the county's action on 26 October 1979. Appellants appealed to the Court of Appeals and that court affirmed. Judge Wells dissented and appellants appealed to this Court as a matter of right. Other facts pertinent to our decision are noted below.

## II.

[1] We first determine the appropriate standard for judicial review of this appeal from the Property Tax Commission, a state administrative agency. We first note that the Court of Appeals erred in holding that the Administrative Procedure Act (APA) controls the scope of review on this appeal.

G.S. 150A-43, a part of the APA, provides in pertinent part that "[a]ny person who is aggrieved by a final agency decision . . . is entitled to judicial review of such decision under this Article, *unless adequate procedure for judicial review is provided by some other statute, in which case the review shall be under such other statute.*" (Emphasis added.) The question, therefore, is whether "some other statute" provides "adequate procedure for judicial review" such that the APA review statutes become inapplicable.

In determining what is "adequate procedure for judicial review," as those words appear in G.S. 150A-43, we held in State ex rel. *Commissioner of Insurance v. Rate Bureau,* 300 N.C. 381, 395, 269 S.E. 2d 547, 559 (1980), that adequate procedure for judicial review exists under some other statute only if the scope of review is equal to that provided for by the APA.

Here, there is "some other statute" providing for judicial review of decisions of the Property Tax Commission. G.S. 105-345.2 governs the extent of review for appeals from the Property Tax Commission and its provisions are remarkably identical to those found in G.S. 150A. Subsection (a) provides that the appellate court shall review the record and exception and assignments of error in accordance with the Rules of Appellate Procedure. Subsection (b) provides that the appellate court shall

(1) decide all relevant questions of law, (2) interpret constitutional and statutory provisions, and (3) determine the meaning and applicability of the terms of any Commission action.

More importantly, with respect to this appeal, G.S. 105-345.2(b) provides that the court may (1) affirm, (2) reverse, (3) declare null and void, (4) remand for further proceedings, or (5) reverse or modify the decision of the Property Tax Commission if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

    (1) In violation of constitutional provisions; or

    (2) In excess of statutory authority or jurisdiction of the Commission; or

    (3) Made upon unlawful proceedings; or

    (4) Affected by other errors of law; or

    (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or

    (6) Arbitrary or capricious.

G.S. 105-345.2(c) provides that the court shall review the whole record and due account shall be taken of the rule of prejudicial error.

In *Commissioner of Insurance v. Rate Bureau*, 300 N.C. at 395, 269 S.E. 2d at 559, we held that, in the interest of uniformity and judicial review of administrative decisions, G.S. 150A-51 was the controlling judicial review statute in insurance ratemaking cases even though Chapter 58, dealing with the North Carolina insurance laws, contained virtually identical review provisions. There, however, the provisions of Chapter 58 had been enacted by our General Assembly in 1971, prior to the enactment of the APA in 1973. Here, the review provisions for appeals from the Property Tax Commission, found in G.S. 105-345.2, were enacted by our Legislature in 1979, six years *after* the enactment of the APA. Therefore, we hold (1) that the procedure for judicial review provided by G.S. 105-345.2 is equal to that under the APA and (2) that G.S. 105-345.2 is the controlling judicial review statute for appeals from the Property Tax Commission.

Although it incorrectly identified the appropriate statutory standard for review on this appeal, the Court of Appeals correctly noted that the principles established by this Court in *In re Appeal of Amp, Inc.*, 287 N.C. 547, 215 S.E. 2d 752 (1975), are relevant to the decision of this case. There, Justice Copeland enunciated several well-established principles concerning appellate review of administrative agency decisions: (1) a reviewing court is not free to weigh the evidence presented to an administrative agency and substitute its evaluation of the evidence for that of the agency, citing *Clark Equipment Co. v. Johnson*, 261 N.C. 269, 134 S.E. 2d 327 (1964); (2) ad valorem tax assessments are presumed to be correct, citing *Albemarle Electric Membership Corp. v. Alexander*, 282 N.C. 402, 192 S.E. 2d 811 (1972); (3) the correctness of tax assestments, the good faith of tax assessors and the validity of their actions are presumed, citing 72 Am. Jur. 2d State and Local Taxation § 713 (1974); and (4) the taxpayer has the burden of showing that the assessment was erroneous, citing *Albemarle Electric Membership Corp. v. Alexander*, 282 N.C. 402, 192 S.E. 2d 811.

We also noted in *Amp* that the presumption of correctness by the county officials is, of course, rebuttable:

> [I]n order for the taxpayer to rebut the presumption [of correctness] he must produce "competent, material and substantial" evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of evaluation; AND (3) the assessment *substantially* exceeded the true value in money of the property. [Citation omitted.] Simply stated, it is not enough for the taxpayer to show that the means adopted by the tax supervisor were wrong, he must also show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably high.*

287 N.C. at 563, 215 S.E. 2d at 762 (emphasis in original). We agree with the Court of Appeals that the foregoing statement continues to be the law of this state. As noted below, however, our application of these principles to the record before us leads to a conclusion different from that reached by the Court of Appeals. In our discussion of the substantive merits of this controversy

below, we will, in each instance, identify the appropriate standard of review from the foregoing discussion.

### III.

In order to address properly the arguments presented by this appeal, it is necessary to review the mechanical statutory provisions which outline the methods and procedures for the appraisal of property for purposes of ad valorem property taxation.

The provisions governing the listing, appraisal, and assessment of property and collection of property taxes are found in the Machinery Act, G.S. §§ 105-271 to 395 (1979). The purpose of the Machinery Act is "to provide the machinery for the listing, appraisal, and assessment of property and the levy and collection of taxes on property by counties and municipalities." G.S. § 105-272 (1979).

Under the Machinery Act, all property in the state, both real and personal, is subject to taxation unless it is (1) excluded by a statute of statewide application enacted under the classification power given the General Assembly by Article V, Section 2(2), of the North Carolina Constitution, or (2) exempted from taxation by the constitution or by a statute of statewide application enacted under the authority given the General Assembly by Article V, Section 2(3) of the North Carolina Constitution. G.S. § 105-274 (1979). Contained in the Machinery Act are numerous provisions which exclude or exempt certain types of property from taxation. Pertinent to this appeal is the special treatment accorded certain agricultural, horticultural and forest land as "special classes" of property under authority of Article V, Section 2(2) of the North Carolina Constitution by virtue of G.S. 105-277.3 (1979). In order to qualify for the special treatment, the agricultural, horticultural or forest land must meet certain land size, use, and ownership requirements. *Id.*

Present use valuation is available for the types of property described in G.S. 105-277.3 if that property has a greater value for other uses and if a timely and proper application for the special treatment is filed with the county tax supervisor. G.S. § 105-277.4(a) (1979). The application must show that the property is of a class eligible for the special treatment and must give any relevant information needed to appraise the property at its pres-

ent use value. *Id.* The county supervisor, at the time of each octennial reappraisal, is required to prepare a schedule of land values, standards and rules which, when properly applied, result in the appraisal of qualified property at its present use. G.S. § 105-277.6(c) (1979). The purpose of this requirement is to ensure uniform appraisal of qualified property in each county. *Id.* When the tax supervisor receives a timely and proper application for present use valuation, the property, if qualified, is appraised according to the most recently adopted schedule of values. G.S. § 105-277.4(b) (1979). In every case, the burden of establishing entitlement to present use valuation is on the property owner. *See* G.S. § 105-282.1 (1979).

The standards and factors used in appraising real property at its market value vary greatly from those used in determining present use value. The "Uniform Appraisal Standards," which apply to all real and personal property not entitled to an exemption or exclusion, provide, in part:

> All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any complusion to buy or to sell and *both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.*

G.S. § 105-283 (1979) (emphasis added). In contrast, the standards for appraisal of agricultural, horticultural and forest land[1] at its present use value provide for appraisal at:

> the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell, *assuming that both of them have reasonable knowledge of the capability of the property to*

---

1. The definitions of the terms agricultural land, forestland and horticultural land are found in G.S. § 105-277.2(1) - (3).

*produce income in its present use and that the present use of the property is its highest and best use.*

G.S. § 105-277.2(5) (1979) (emphasis added).

Comparison of the two standards reveals this clear distinction: In appraising property not eligible for present use valuation, the hypothetical buyer and seller have reasonable knowledge of all uses to which the property is adapted, while for the purposes of the present use valuation the hypothetical buyer and seller have reasonable knowledge *only* of the property's capability to produce income in its present use and it is assumed that the present use is the highest and best use. That the valuation of property not eligible for present use valuation is made according to a far broader standard than property eligible for the special treatment is made even clearer by the provisions of G.S. 105-317, which applies to real property in general. That statute provides that:

Whenever any real property is appraised it shall be the duty of the persons making the appraisals: (1) In determining the true value of land, to consider as to each tract, parcel, or lot separately listed at least its advantages and disadvantages as to location; zoning; quality of soil; waterpower; water privileges; mineral, quarry, or other valuable deposits; fertility; adaptability for agricultural, timber-producing, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value except growing crops of a seasonal or annual nature.

.  .  .  .

G.S. § 105-317(a).

Certain provisions of the Machinery Act apply to both market and present use appraisals. For instance, all property being appraised must "be actually visited, observed, and appraised by a competent appraiser." G.S. § 105-317(b)(2) (1979). Moreover, G.S. 105-317(c) provides that the schedules of values, standards and rules for all types of valuation must be reviewed and approved by the Board of County Commissioners before they are used. After such approval the board must issue an order adopting the schedules, standards and rules and:

shall cause a copy of the order to be published in the form of a notice in a newspaper having general circulation in the

county, stating in the notice that the schedules, standards and rules to be used in the next scheduled reappraisal of real property have been adopted and that they are open to examination by any property owner . . . for a period of 10 days from the date of publication of the notice.

G.S. § 105-317(c) (1979). Any property owner who believes that the schedules, standards and rules fail to meet the appraisal standard may except to the order and appeal to the Property Tax Commission within thirty days after the date of publication by filing a written notice of the appeal, accompanied by a written statement of the grounds of appeal, with the clerk of the board of county commissioners and with the Property Tax Commission. *Id.*

With both the scope of review and the statutory scheme in mind, we now address the issues presented on this appeal. For reasons discussed in detail below, we conclude that the county failed to comply with the statutory procedures to appellants' prejudice.

## IV.

[2] We first consider appellants' argument that Wilkes County failed to comply with the requirements of G.S. 105-317(c) and, in failing to give adequate notice of the schedules, standards and rules to be employed by the county in the reappraisal of real property, denied them due process of law. We note with interest that both the Property Tax Commission and the Court of Appeals concluded that the county made only a token effort to inform property owners that the schedule in question had been adopted. Both, however, held that the county had complied with statutory and due process notice requirements. We disagree and hold that the token effort made by the county was insufficient to fulfill the due process requirement of adequate notice.

The record discloses that the schedule in question was approved by the Wilkes County Board of Commissioners on 24 September 1974. On 26 September 1974 the following notice was published in a county newspaper, *The Journal-Patriot:*

## NOTICE

Schedules, standards and rules for the next revaluation of Wilkes County were approved by the Board of County Com-

missioners in regular meeting, September 24, 1974. They are open to examination by any property owner of the County at the office of the Tax Supervisor for a period of 10 days.

Contained in the record is a photocopy of the page of the newspaper on which the stated notice was printed. It is obvious from our review that the notice was printed in the smallest possible print and was buried in a page containing two large pictures taken at a football game, three general news articles, a notice of public hearing and an advertisement for a local drive-in theater. More significantly, however, the notice was printed some twenty-seven months before the effective date of the revaluation. While the Court of Appeals was correct in noting that the statute does not set a time frame or a minimum size for the required notice, by no stretch of the imagination can we believe that the notice disclosed by this record comports with the fundamental notions of due process.

The County asserts, however, that the case of *Brock v. Property Tax Commission*, 290 N.C. 731, 228 S.E. 2d 254 (1976), is dispositive of this issue and requires that we find the notice given in this case sufficient. In *Brock*, the property owners contested the valuation of their farmland. There, as here, no objection to the schedules was made by the appellants within ten days after the publication of the notice. Unlike the appellants here, however, the taxpayers in *Brock* contested only the application of the schedules to their land and not the schedules themselves. In discussing the adequacy of the notice, Justice Huskins, writing for the Court, stated:

> Other questions posed in appellants' brief need not be discussed. It suffices to say that the notice of the adoption of the schedules was published in newspapers having general circulation in Jones County, and the publication complied in all respects with G.S. 105-317(c). Questions raised regarding the adequacy of the notice are now moot since petitioners are not attacking the schedules.

290 N.C. at 740, 228 S.E. 2d at 260. From this passage it is obvious that the Court in *Brock* did not consider the *constitutional* adequacy of the notice. Additionally, we note that the notice in *Brock* was more specific than that given here and that it was

published less than four months prior to the effective date of the revaluation.

G.S. 105-286(1) requires Wilkes County to re-appraise all real property as of January 1, 1977. The statute does not set a time period in which the revaluation process must begin; it merely provides that revaluation must be completed by January 1, 1977, and every eighth year thereafter. The decision when to begin the revaluation process is left to the wisdom of the individual counties, limited only by practical considerations. Wisdom would dictate that, in times of rampant inflation or widely fluctuating real estate values, the revaluation would take place as close as possible to the effective date.

Here, the reappraisal process began in late June of 1974 and lasted, at best, two months, concluding some twenty-seven months prior to the effective date. Such a lengthy period between appraisal and the effective date seems highly questionable. Moreover, when the notice of the adoption of new schedules is given far in advance of the effective date of the schedules, it becomes even more unlikely that the affected taxpayers will be looking for or will see a public notice buried in the back pages of a local newspaper among the classified advertisements and obituaries.

The timing of the notice, its size, the generalities of wording and its single publication lead us to conclude that it was not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950); *accord, Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed. 2d 30, 41 (1978). As such, the notice is insufficient to fulfill the due process requirement and to bar an attack against the revaluation schedules themselves. The action of the Property Tax Commission in affirming the procedure employed by Wilkes County was in violation of constitutional provisions and made upon unlawful proceedings within the meaning of G.S. 105-345.2(b)(1) and (3).

## V.

[3] We next turn to appellants' contention that Wilkes County violated the provision of G.S. 105-317(b)(2) which provides that

"*every* lot, parcel, tract, building, structure, and improvement being appraised be *actually visited, observed* and *appraised* by a competent appraiser, either one appointed under the provisions of G.S. 105-296 or one employed under the provisions of G.S. 105-299." (Emphasis added.) The legislative directive is crystal clear: all property being reappraised by a county must receive an on-site visit and observation by the appraiser.

The record before us discloses that Wilkes County flagrantly violated this legislative directive. First, the short time span in which the revaluation process took place clearly indicates that on-site visits and observations of all the property in Wilkes County could not have been made. Moreover, the testimony before the Property Tax Commission indicated that no such visits took place. Appellant Osborne testified, "I was present at both Board of Equalization hearings. We asked Mr. Allen if he or any of his appraisers had personally viewed any of this property and he said, 'No.'"

While not presented to us by either party, we would be remiss not to mention our awareness that the requirement of this section of our statute might well be, in some instances, impractical, if not virtually impossible. The answer, of course, is that this directive to county officials is one from our General Assembly and any changes in that directive must be made by the legislative body. This Court cannot, on the record before us, proceed on any basis other than a literal reading of the clear statutory language.

We hold, therefore, that the revaluation of appellants' properties was illegally done by virtue of the county's failure to comply with G.S. 105-317(b)(2), and the Court of Appeals erred in affirming the Property Tax Commission's decision. The decision of the Property Tax Commission upholding the determination of the Wilkes County Board of Equalization and Review is affected by error of law, G.S. § 105-345.2(b)(4), in that it failed to find that the county's revaluation violated statutory directives.

VI.

[4] We also conclude from a review of the record before us that the appraisal process employed by Wilkes County of appellants' properties in 1974 failed to comply with other statutory requirements so as to render the process arbitrary.

The record discloses failure to comply with other statutory directives contained in G.S. 105-317. Most of these failures, we think, result from the county's decision to revalue the property nearly two and one-half years before the effective date of the revaluation and the short time period in which the county's entire revaluation process took place. As noted above, Mr. Allen testified that he was retained by the county in the summer of 1974 to conduct the reappraisal and that the county commissioners adopted his recommendations on 24 September 1974. The appraisers could not have considered the statutory considerations for determining property values during this short time period. The record does not demonstrate, and in no way can we imagine, that such factors as "quality of soil . . . ; fertility; adaptability for agricultural, timber-producing, commercial, industrial, or other uses; past income; probable future income . . . ," G.S. § 105-317(a) (1), could have received any consideration whatsoever by the appraisers in the short time period they were on the job. Testimony of Mr. Allen on deposition is illustrative of the arbitrary nature of the revaluation process and his failure to comply with the statutory scheme set out in Section III of this opinion. He testified that:

We built the schedule based on comparables. . . .

. . . .

. . . It's utterly impossible at the beginning of an appraisal program to establish values county-wide, without making a county-wide appraisal. A classification made after we've been here three to five weeks is not of much value. We're building a rural land schedule in 1974 to use in January of 1977 primarily because the law requires us to do it.

. . . .

. . . This use value schedule is basically the same thing as the market value schedule, all the way through, with respect to everything. Other than just the schedule itself, there is nothing else in the book here that refers to use value at all. That's all there is. I told the County Commissioners on that night that I have a land use schedule. It's identical to the rural land market value schedule. I also said that I had

the same support for the use value schedule as I had for the market value schedule. I wasn't asked any questions particularly about the use value schedule.

Based on the foregoing, and our review of the entire record, we are compelled to agree with appellants' assertion that the appraisal process was done primarily in the office of the Register of Deeds. Clearly, the complete consideration of all factors enunciated by G.S. 105-317(a)(1) was not given.

There is no statutory proscription against Wilkes County's conducting a revaluation process some two and one-half years prior to the effective date and completing the process within a short time frame. However, this Court lives in the same economic world as does our Legislature and the Board of County Commissioners of Wilkes County. We do not think it requires citation of legal authority to observe that a decision to conduct an appraisal in a time of less than two months, and to complete it some twenty-seven months prior to its effective date, does not comport with the realities of the economic world and is plainly arbitrary. Our view in this respect is buttressed by G.S. 105-317(a)(3) which requires that partially completed buildings be appraised "in accordance with the degree of completion on January 1." Clearly, that statute contemplates a revaluation process in closer proximity to the effective date than that employed by Wilkes County in the case before us.

We also note the requirements of G.S. 105-317(b)(1) that:

There be developed and compiled uniform schedules of values, standards, and rules to be used in appraising real property in the county. (The schedules of values, standards and rules shall be prepared in sufficient detail to enable those making appraisals to adhere to them in appraising the kinds of real proberty commonly found in the county; they shall be:

a. Prepared prior to each revaluation required by G.S. 105-286;

b. In written or printed form; and

c. Available for public inspection upon request.)

We are unable to find any reference to standards and rules for use in the revaluation process in those portions of the minutes of the meetings of the Wilkes County Board of Commissioners contained in the record. The notice run in *The Journal-Patriot* did state that "Schedules, standards and rules for the next revaluation . . ." had been approved by the county commissioners and were open for public examination. Perhaps such required standards and rules were adopted. We are unable, however, on the record before us, to find any reference to them.

While only one of the failures discussed above, standing alone, might be insufficient to compel our conclusion of arbitrariness, we are unable to ignore the collective impact of these failures here. Indeed, they compel the conclusion that the county approached the revaluation process in an almost casual way and in clear disregard for numerous statutory requirements.

Failure of the Property Tax Commission to recognize the arbitrary and capricious approach taken by the county in this instance was, in itself, arbitrary within the meaning of G.S. 105-345.2(b)(6).

## VII.

[5] We now turn to the contention of appellee that, even assuming irregularity in the revaluation process, this Court is without authority to disturb the Property Tax Commission's decision in light of the review provisions set out by this Court in *Amp*, 287 N.C. 547, 215 S.E. 2d 752, discussed in Section II of this opinion. The Court of Appeals agreed with the appellee, stating that, "the second prong of the test—*i.e.*, whether the assessment substantially exceeded the true value in money of the property—is not violated." We think that both appellee and the Court of Appeals misunderstand *Amp* as it relates to the standards of judicial review set forth in G.S. 105-345.2.

In Section II of this opinion, we set out the judicial review standards of G.S. 105-345.2 and those enunciated by this Court in *Amp*. We will not repeat that section here. Here, our purpose is merely to relate and summarize the statutory provisions with the provisions set forward in *Amp* and apply it to the facts before us.

As we understand appellee's contention, it is basically that this Court, under *Amp*, is powerless to overturn the Property

Tax Commission in this case because of the rule that no court can weigh the evidence presented to a state administrative agency and substitute its evaluation of the evidence for that of the agency. Put another way, appellee argues that a court is without authority to make findings at variance with the findings of the board when the findings of the board are supported by competent, material and substantial evidence. We have no quarrel with these basic, general statements of black letter administrative law. They are, however, taken out of context in relation to the record before us.

As noted in *Amp*, the presumption is that the county acted with regularity in the valuation process, and the burden is upon the taxpayer to show otherwise. At this point, the taxpayer must show by competent, material and substantial evidence that one of the first two tests enunciated in *Amp* has not been met, *i.e.*, either that the county employed an arbitrary or an illegal method of valuation. Here, appellants have clearly carried that burden. Our discussion in the preceding three sections of this opinion indicates the illegality and arbitrariness of the county's valuation process. G.S. 105-345.2(b) provides that in order for a court to reverse or modify the decision of the Property Tax Commission the "substantial rights" of appellants must "*have been prejudiced*" because of the illegality or arbitrariness. To show this prejudice of substantial rights, we turn back to the rule enunciated in *Amp* which requires that, in addition to showing illegality and arbitrariness, the taxpayer must also show that the assessment substantially exceeded the accurate valuation, *i.e.*, that the valuation was unreasonably high. Put another way, the second prong of the test set out in *Amp* explains what the substantial prejudice required by G.S. 105-345.2 is: substantial prejudice is a substantially higher valuation than one which would have been reached under a legal valuation process. Here, appellants have clearly carried their burden on this point as well. They have shown by competent, material and substantial evidence that the present use value of their property is thirty to forty dollars per acre.

When a taxpayer has rebutted the presumption of regularity in favor of the county, as appellants have here, the burden then shifts to the county to demonstrate to the Property Tax Commission that the values determined in the revaluation process were

not substantially higher than that called for by the statutory for-
mula, and the county must demonstrate the reasonableness of its
valuation "by competent, material and substantial evidence," G.S.
§ 105-345.2(b)(5).

At this juncture, we reiterate that it is the function of the
administrative agency to determine the weight and sufficiency of
the evidence and the credibility of the witnesses, to draw in-
ferences from the facts, and to appraise conflicting and cir-
cumstantial evidence. We cannot substitute our judgment for that
of the agency when the evidence is conflicting. *Commissioner of
Insurance v. Rate Bureau*, 300 N.C. 381, 269 S.E. 2d 547. However,
when evidence is conflicting, as here, the standard for judicial
review of administrative decisions in North Carolina is that of the
"whole record" test. *Thompson v. Wake County Board of Educa-
tion*, 292 N.C. 406, 233 S.E. 2d 538 (1977); *In re Rogers*, 297 N.C.
48, 253 S.E. 2d 912 (1979). As Justice Exum stated in *Rogers*:
"The 'whole record' test is not a tool of judicial intrusion; instead,
it merely gives a reviewing court the capability to determine
whether an administrative decision has a rational basis in the
evidence." *Id.* at 65, 253 S.E. 2d at 922. In Thompson, Justice
Copeland clearly explained the "whole record" test:

> This standard of judicial review is known as the "whole
> record" test and must be distinguished from both *de novo*
> review and the "any competent evidence" standard of review.
> *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 95 L.Ed.
> 456, 71 S.Ct. 456 (1951); *Underwood v. Board of Alcoholic
> Control*, 278 N.C. 623, 181 S.E. 2d 1 (1971); Hanft, *Some
> Aspects of Evidence in Adjudication by Administrative
> Agencies in North Carolina*, 49 N.C.L. Rev. 635, 668-74 (1971);
> Hanft, *Administrative Law*, 45 N.C.L. Rev. 816, 816-19 (1967).
> The "whole record" test does not allow the reviewing court
> to replace the Board's judgment as between two reasonably
> conflicting views, even though the court could justifiably
> have reached a different result had the matter been before it
> *de novo*, Universal Camera Corp., *supra*. On the other hand,
> the "whole record" rule requires the court, in determining
> the substantiality of evidence supporting the Board's deci-
> sion, to take into account whatever in the record fairly
> detracts from the weight of the Board's evidence. Under the
> whole evidence rule, the court may not consider the evidence

which in and of itself justifies the Board's result, without taking into account the contradictory evidence or evidence from which conflicting inferences could be drawn. Universal Camera Corp., *supra*.

292 N.C. at 410, 233 S.E. 2d at 541; *accord, In re Rogers*, 297 N.C. 48, 253 S.E. 2d 912; *Brooks v. McWhirter Grading Co.*, 303 N.C. 573, 281 S.E. 2d 24 (1981).

We will, in the succeeding section of this opinion, proceed to review the evidence disclosed by the record before us to determine whether it is sufficient to support the commission's findings and conclusion upholding the actions of the Wilkes County Commissioners in revaluing appellants' properties.

## VIII.

[6]     Before reviewing the substantiality of the evidence under the "whole record" test as discussed in the preceding section, we first address appellants' contention that use of comparable sales in determining a present use valuation schedule is improper. For reasons explained below, we agree that use of comparable sales in the manner described by the record to determine present use valuation is improper and that the Property Tax Commission's failure to so find constituted an error of law as contemplated by G.S. 105-345.2.

As discussed in Section III of this opinion, the statutory provisions for determining "true value" (or market value) and "present use value" are clearly different. There is a common denominator: the price at which the property in either case would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell. Beyond this common denominator, however, the valuation standards differ drastically. In the case of property not subject to present use valuation, G.S. 105-283 provides that both buyer and seller shall have knowledge "of all the uses to which the property is adapted and for which it is capable of being used." Moreover, G.S. 105-317(a) lists numerous factors to be used in determining the true value of land not subject to present use valuation. Where *all uses* to which property may be adapted is the criterion, the use of comparable sales as *one factor* in determining the true value of property is both reasonable and acceptable. Even in the

free market the use of comparable sales is a commonly accepted practice.

Such is not the case, however, in determining the *present use value* of agricultural, horticultural and forest land as contemplated by G.S. 105-277.2(5). Here, the criterion is that both buyer and seller shall "have reasonable knowledge of the capability of the property to produce income *in its present use* . . . ." (Emphasis added.) In this instance, the clear legislative intent is that property be valued on the basis of its ability to produce income in the manner of its present use. All other uses for which the property might be employed and the many factors enunciated in G.S. 105-317(a) are irrelevant and immaterial. The focus of the appraisal is a narrow one: If the use of the property subject to present use valuation continues as at present what income will the property produce?

We think the use of sales of similarly used land by Wilkes County was clearly improper. To allow the indiscriminate use of sales of similarly used land in establishing present use valuation without knowing whether buyers and sellers intended to continue the use of the property in its present form contravenes the clear intent of the statute. It is well known that people buy property for various purposes;[2] this present use valuation requires that there be only one purpose, the continuation of the use of the property as at present.

---

2. Indeed, Paul Osborne, a real estate agent specializing in sales of timberland and one of the property owners contesting the valuation of his land, testified before the Property Tax Commission:

> The factors which influence the sales price of property similar to [petitioner Johnston's land] in Wilkes County are the location, access, what kind of roads to it, what it could be used for, and if it could be subdivided into smaller tracts, recreation purposes, and various things like that. A recreational purpose for a portion of this land could be campgrounds. There are none in the vicinity of this property. Stone Mountain Park is the closest and it is a State Park. Powder Horn Mountain is all around Mr. Johnston's property. The KOA Campground is all round the McElwee property, right in it. These are factors which figure into a transaction when property is bought and sold in Wilkes County, mountain property or boundary property such as this we are discussing. Some people want to buy some land. Out-of-state people come in and want to buy land. We sold 136 acres over in Walnut Grove last year to a pilot who flies in Arabia. He is an American, just wanted to own some land. He liked the looks of it and bought it. One of the big factors is that people buy land and hope it will go up and sell it and make some money. Some bought it and now

This is not to say, however, that sales of similarly used lands may never be used to establish present use valuation. Sales of such land may be used if they are sales of land actually comparable to the land whose present use value is being determined. In order for a county to use sales of similarly used land in establishing present use valuation, the county must demonstrate that the buyers and sellers involved in the comparable sales transactions had knowledge of the property's capability to produce income in its present use, that the present use is the highest and best use and that the purchaser intended to continue to use the property in its present use.[3] If a truly comparable sale can be found—one of land of the same quality, used for the same purposes and whose present use is its highest and best use—the sale price received does reflect the present use value. Here, there was no attempt to qualify the sales on which the valuation was based as truly comparable sales. We know only that those sales were of forestland and that the new owners presently use it as such. We know nothing of its intended future use or what was in the minds of the buyer and seller.

Here, the record discloses that the appraisers employed comparable sales in establishing the special use valuation schedule for Wilkes County, and Mr. Allen so testified. The County Tax Supervisor testified that the comparable sales were used in arriving at the valuation schedule. Indeed, the Property Tax Commission concluded: "The $100 is also supported by sales of comparable property introduced by the county."

We hold, therefore, that the Court of Appeals erred in its conclusion that the Property Tax Commission had not committed

---

are trying to sell it. Factors like investment purposes and recreational purposes drive the price of property up. If the property were restricted for growing timber only, the price would be lower. If a man had to buy property and sold it to grow timber, it would be altogether different than comparable sales for other uses.

3. We acknowledge that the principle discussed above cannot be applied to determine the present use value of useless land, i.e., land which has no present income-producing capability. In such a case, however, the land, by definition, would not qualify for present use valuation for the very reasons that it produces no income and that it has no higher and better use. See G.S. § 105-277.4. Hence, the valuation of such land is determined under the true or market value method, G.S. § 105-283, and the use of comparable sales in determining ad valorem tax value is permissible.

an error of law as contemplated by G.S. 105-345.2 by upholding the use of sales of similarly used land as a factor upon which a present use valuation was based.

[7] With the foregoing in mind, we now review the evidence before the Property Tax Commission to determine if that body's findings and conclusions are supported by competent, material and substantial evidence in view of the whole record. G.S. 105-345.2. *Thompson v. Wake County Board of Education*, 292 N.C. 406, 233 S.E. 2d 538.

On the basis of our review of the entire record we are compelled to conclude that the findings and conclusions of the Property Tax Commission with respect to the present use valuation of appellants' properties are not supported by competent, material and substantial evidence in view of the entire record. All evidence with respect to comparable sales was irrelevant for the reasons stated above. The only remaining evidence which supports the $100 per acre present use valuation came from the witness Edwin McGee. He testified that his opinion, as a county forester, was that the use value per acre would be "in the neighborhood of $100." Later, however, he qualified his answer by stating that this valuation would be based on a 25% increase in timber production on the property. County Tax Supervisor, John Hoots, testified that, "My opinion dollar-wise as to the use value per acre is $100 per acre." However, Mr. Hoots qualified his answer with this addendum: "I based that opinion on the market and the production of the timber land in Wilkes County—the market value and what the timber will bring on the stump." Clearly, Mr. Hoots was using market value sales as a criterion for his opinion, a basis we have rejected above.

Appellants, on the other hand, presented abundant evidence to support their contention that their property was worth, for present use purposes, $30 to $40 per acre. Several witnesses testified that the average annual growth for the timber on appellants' land would be from 200 to 210 board feet and that the 200 to 210 board feet annual growth would produce a gross annual yield of $30 to $40 and a net yield after expenses of $3 to $4 per acre. Indeed, the Property Tax Commission included these figures in its findings of fact. In support of their contention that these figures substantiate a present use valuation of $30 to $40

per acre, appellants also presented witnesses who testified that a 10% capitalization rate was justified. Typical is the testimony of Roy Carter, a member of the faculty of the School of Forestry at North Carolina State University:

> The average capitalization rate used in the forestry industry for net return per year has been up until the last five years. It has been in the neighborhood of five to six percent. Since our general interest rates have increased, the forest lands have increased in their rates, also. It is around 10 percent now.

Application of the capitalization theory was also explained by Carter:

> You have management expenses and taxes and personnel expenses and other things that are involved which you deduct from the total income that you receive . . . and arrive at a net return for the land. If you had a net return over the period of 60, 70 or 80 years, you might have maybe $30 or $40 per acre per year net return. If you had a net return of $30 and you expected ten percent return on your investment, you would then have $30 actual return per acre per year. That is capitalizing.

We think appellants' contention that the capitalization approach is appropriate for present use valuation is entirely proper. While our statutes nowhere incorporate that precise terminology, we think the intent of our Legislature in approving such an approach is clear from the language in G.S. 105-277.2(5) that both buyer and seller have reasonable knowledge "*of the capability of the property to produce income in its present use*" (emphasis added). Moreover, Wilkes County itself apparently places credence in the capitalization approach. Tax Supervisor Hoots testified, "Well, to get the use value, you have to get the yield and compute it on some kind of cap[italization] rate to get the use value. You have got to have a net income."

Applying the rules stated by this Court in *Thompson* that we may not consider the evidence justifying the Commission's result without taking into account contradictory evidence and whatever in the record fairly detracts from the weight of the Board's evidence, we hold that the Commission's findings and conclusions

are not supported by competent, material and substantial evidence in view of the entire record as submitted, G.S. 105-345.2(b)(5).

For the reasons stated above, the decision of the Court of Appeals is reversed. This cause is remanded to that court with instructions that it remand to the North Carolina Property Tax Commission to determine the present use value of appellants' property as of 1 January 1977 in a manner not inconsistent with this opinion.

Reversed and remanded.