IN RE APPEAL OF PHILIP MORRIS U.S.A.

[108 N.C. App. 514 (1993)]

———————

IN THE MATTER OF: THE APPEAL OF PHILIP MORRIS U.S.A. FROM THE DECISION OF THE CABARRUS COUNTY BOARD OF EQUALIZATION AND REVIEW FOR PERSONAL PROPERTY TAXES YEARS 1984-1989

No. 9110PTC762

(Filed 5 January 1993)

**Taxation § 25.3 (NCI3d)— ad valorem taxes—property audit agreement—contingent fee—choice of audit sample—public policy violation**

A county's business personal property audit agreement which gave the auditor the discretion to choose the audit sample and compensated the auditor at the rate of thirty-five percent of taxes discovered violated public policy and discoveries resulting from the contract were void.

**Am Jur 2d, State and Local Taxation §§ 704, 720, 725.**

Appeal by Cabarrus County from a Final Decision of the Property Tax Commission entered 24 May 1991. Appeal and cross-

———————

IN RE APPEAL OF PHILIP MORRIS U.S.A.

[108 N.C. App. 514 (1993)]

appeal by Philip Morris U.S.A. from the same Final Decision. Heard in the Court of Appeals 26 August 1992.

*Parker, Poe, Adams & Bernstein, by Charles C. Meeker, for Cabarrus County.*

*Hunton & Williams, by William S. Patterson, Jean Gordon Carter, James W. Shea, and David A. Agosto, for Philip Morris U.S.A.*

*James B. Blackburn III and S. Ellis Hankins, on behalf of the North Carolina Association of County Commissioners and the North Carolina League of Municipalities, amici curiae.*

*Poyner & Spruill, by Wilson Hayman, on behalf of Investment North Carolina, Inc., amicus curiae.*

*Floyd Allen & Jacobs, by Jack W. Floyd and Robert V. Shaver, Jr., on behalf of Guilford Mills, Inc., amicus curiae.*

*Johnson Gamble Mercer Hearn & Vinegar, by Charles H. Mercer, Jr. and M. Blen Gee, Jr., and Maupin Taylor Ellis & Adams, P.A., by Charles B. Neely, Jr. and Nancy S. Rendleman, on behalf of North Carolina Citizens for Business and Industry, amicus curiae.*

*Charles Ewart, Thomas W. Ramseur, Thomas W. Dayvault, and Carroll D. Gray, on behalf of the North Carolina Association of Chamber of Commerce Executives, the Concord-Cabarrus County Chamber of Commerce, the Kannapolis Chamber of Commerce, and the Charlotte Chamber of Commerce, amici curiae.*

LEWIS, Judge.

The question posed to us by this appeal appears to be one of first impression in North Carolina. We are asked to determine whether a contingent fee contract between a county tax assessor and a private auditing firm is void as against public policy. We hold that, under the facts of this particular contract, it is, and affirm the Final Decision of the North Carolina Property Tax Commission.

In May 1988, the tax assessor of Cabarrus County entered into a Business Personal Property Audit Agreement ["agreement"] with Tax Management Associates, Inc. ("TMA"). The Cabarrus Coun-

**IN RE APPEAL OF PHILIP MORRIS U.S.A.**

[108 N.C. App. 514 (1993)]

ty Board of Commissioners accepted the contract on 16 January 1989. TMA agreed to provide Cabarrus County with audit services "on a reasonable sample of the County's business personal property taxpayers," in accordance with applicable North Carolina General Statutes, specifically §§ 105-283, 105-317.1, and 105-312. The fee arrangement set between the parties required Cabarrus County to pay to TMA thirty-five percent of taxes discovered, including penalty. Philip Morris U.S.A. ("Philip Morris") contends such a contract is (1) void as against public policy and (2) unconstitutional.

Philip Morris has a cigarette manufacturing facility in Cabarrus County which has the capacity to produce 83 billion cigarettes a year. The company is the largest taxpayer in Cabarrus County. In November 1988, TMA contacted Philip Morris to initiate an audit of its records.

In December 1989, following an audit of Philip Morris for the years 1983-1989, the Cabarrus County tax assessor proposed discovery for those years in the amount of $1,325,000,000.00 plus penalties. To discover property means to determine property that was not listed or property that was listed but was substantially undervalued in its listing by the taxpayer. *See* N.C.G.S. § 105-273(6b) (1992). On 8 May 1990, the assessor issued his final decision regarding discovery of Philip Morris' personal property. The discovery from this decision included the years 1984-1989, and totaled $923,339,510.00.

Pursuant to N.C.G.S. § 105-312(d) (1992), Philip Morris requested review by the Cabarrus County Board of Equalization and Review. After a hearing, the Board reduced the amount of the discovery to $599,426,934.00. Philip Morris, on 2 January 1991, filed an Application for Hearing before the Property Tax Commission ("Commission"), seeking review of the Board's decision. On 10 May 1991 Philip Morris filed a "Motion to Declare Discovery Null and Void." In both the appeal and the motion, Philip Morris contended that TMA had no legal standing or authority to conduct the audit because the agreement between Cabarrus County and TMA was "void, illegal, illusory and against public policy."

The Final Decision of the Property Tax Commission was entered 24 May 1991. In this 3-2 decision, the Commission concluded that the appeal was properly before it, and that it had the duty to rule upon all issues concerning listing, appraisal, and assessment of property, but not those of constitutional law. N.C.G.S. § 105-290(b)

(1992). The Commission then found that the contract between TMA and Cabarrus County was "void as against public policy from its inception," and therefore adjudged the discovery null and void.

The Commission reasoned that the contingent fee arrangement as set out in the agreement "so offended conventional standards requiring fair, impartial, and uniform treatment of this State's taxpayers that [the contract] could not stand." The Commission concluded:

> The fundamental rule of our system of property taxation is that the tax will be administered in a fair, impartial, and uniform manner, without regard to the identity of the property owner. This principle cannot be followed where a county enters into a contract such as the one presented here.

Cabarrus County appealed. In an effort to preserve its right to appellate review of the issues raised in the decision, Philip Morris filed a cross-notice of appeal to this Court.

The scope of our review of the Property Tax Commission's Final Decision is governed by N.C.G.S. § 105-345.2 (1992). *In re McElwee*, 304 N.C. 68, 73-74, 283 S.E.2d 115, 119 (1981), *appeal after remand*, 75 N.C. App. 658, 331 S.E.2d 265 (1985). The *McElwee* Court held that the provisions found in N.C.G.S. § 105-345.2 and N.C.G.S. § 150A-43 (now 150B) are

> remarkably identical. . . . Subsection (a) provides that the appellate court shall review the record and exception and assignments of error in accordance with the Rules of Appellate Procedure. Subsection (b) provides that the appellate court shall (1) decide all relevant questions of law, (2) interpret constitutional and statutory provisions, and (3) determine the meaning and applicability of the terms of any Commission action.

> More importantly, with respect to this appeal, G.S. 105-345.2(b) provides that the court may (1) affirm, (2) reverse, (3) declare null and void, (4) remand for further proceedings, or (5) reverse or modify the decision of the Property Tax Commission if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

> (1) In violation of constitutional provisions; or

(2) In excess of statutory authority or jurisdiction of the Commission; or

(3) Made upon unlawful proceedings; or

(4) Affected by other errors of law; or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or

(6) Arbitrary or capricious.

G.S. 105-345.2(c) provides that the court shall review the whole record and due account shall be taken of the rule of prejudicial error.

*Id.*

The question is whether the contingent fee arrangement for auditing services violates public policy. Chapter 105 of the North Carolina General Statutes answers neither yea nor nay on this particular issue. Section 299 does, however, allow county boards of commissioners to employ appraisal firms "or other persons or firms having expertise in one or more of the duties of the assessor to assist him or her in the performance of such duties." N.C.G.S. § 105-299 (1992). This provision, however, does not give authority for contingent fee compensation schemes.

We note that contingent fee contracts are prohibited in at least two instances: One, for lobbying fees pursuant to N.C.G.S. § 120-47.5 (1992); and two, for real estate appraisal assignments pursuant to N.C.G.S. § 93A-80(a)(3) (Cum. Supp. 1992). We cannot agree with Cabarrus County that in the absence of a specific bar, the Legislature intended to allow contingent fee auditor contracts. Conversely, we are aware of no instances where the General Statutes permit contingent fee arrangements for State business.

We find no North Carolina case law on point addressing a contingent fee contract for auditing services. There are cases dealing with other types of contingent fee contracts. It is well-settled in North Carolina that contingent fee contracts for representation in a divorce proceeding are void, *Thompson v. Thompson*, 313 N.C. 313, 328 S.E.2d 288 (1985), as are contingent fee contracts for representation for alimony or child support. *Davis v. Taylor*, 81 N.C. App. 42, 344 S.E.2d 19, *disc. rev. denied*, 318 N.C. 414, 349 S.E.2d 593 (1986). On the other hand, contingent fee arrangements

in equitable distribution actions are valid so long as they do not compensate the attorney for securing the divorce. *In re Cooper*, 81 N.C. App. 27, 344 S.E.2d 27 (1986). They are almost universally used by counsel in personal injury and wrongful death actions.

Contrary to Cabarrus County's arguments, the cases cited above do not directly guide our decision in the present case. However, one important proposition comes out of them. In a case dealing with attorney contingent fee contracts, this Court stated: "Contracts for contingent fees . . . are closely scrutinized by the courts where there is any question as to their reasonableness." *Harmon v. Pugh*, 38 N.C. App. 438, 444, 248 S.E.2d 421, 424 (1978), *disc. rev. denied*, 296 N.C. 584, 254 S.E.2d 33 (1979). We do so now.

North Carolina's tax policy is grounded in notions of fairness and equity, as mandated by the North Carolina Constitution. N.C. Const. Art. V, § 2 cl. (1) & cl. (2). " 'The principles of equality and uniformity are indispensable to taxation, whether general or local. Local taxation must be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and must be assessed upon all the property according to its just valuation.' " *Hajoca Corp. v. Clayton*, 277 N.C. 560, 569, 178 S.E.2d 481, 487 (1971) (citing Desty on Taxation, Vol 2, p. 1119).

We agree with the Property Tax Commission that the principle of fair, impartial administration of taxation is difficult at best with a contract such as this. Under the terms of the Business Personal Property Audit Agreement, TMA was given the authority to audit "a reasonable sample of the county's business personal property taxpayers." This language appears to give TMA the discretion to choose the sample. Furthermore, the contract compensates TMA at the rate of thirty-five percent of taxes discovered. These two provisions lead to the inescapable conclusion that it would be in TMA's best interest to audit the businesses which own the most property and which conceivably would provide the largest discovery. Clearly, the appearance of potential bias, overreaching, and abuse is substantial.

There is no North Carolina case law on point. In *Sears, Roebuck and Co. v. Parsons*, 260 Ga. 824, 401 S.E.2d 4 (1991), the Georgia Supreme Court examined a contract between a county board of tax assessors and a private auditing company whereby the company was to audit tangible personal property returns as provided by the county's chief assessor. The auditing company was to be paid

thirty-five percent of any additional amounts collected as a result of increased valuation as determined by the audit. The board designated Sears, Roebuck and Co. as a taxpayer to be audited under this contract. Sears brought a declaratory judgment action challenging the agreement.

The Georgia Supreme Court held the contract "void as against public policy, not because of the services performed, but because of the contingency scheme of compensation for those services." *Sears*, 401 S.E.2d at 4. The Court reasoned:

> In the exercise of th[e power to tax], the government by necessity acts through its agents. However, this necessity does not require nor authorize the creation of a contractual relationship by which the agent contingently shares in a percentage of the tax collected, and we hold that such an agreement offends public policy. The people's entitlement to fair and impartial tax assessments lies at the heart of our system, and, indeed, was a basic principle upon which this country was founded. Fairness and impartiality are threatened where a private organization has a financial stake in the amount of tax collected as a result of the assessment it recommends.

*Id.* at 5.

We find *Sears* to be generally on point and the principles applicable here. We believe the present facts to be more egregious to the notion of fair and impartial taxation than in *Sears*, because there the chief assessor determined who would be audited, while here TMA is given the discretion to choose its sample of taxpayers. We are persuaded by the reasoning and holding of *Sears*. While there is no evidence of abuse here, we nevertheless hold that the contingent fee arrangement, which gives TMA a financial stake in the auditing process, gives the appearance of bias and potential abuse and violates public policy.

Philip Morris' cross-appeal argues that the contract and resulting discovery are also violative of its due process and equal protection rights under both the federal and state constitutions. We do not agree. Upon our review of the entire record and the appellant and appellee briefs of both parties, we conclude that the matters raised and adjudicated in the Commission's Final Decision are not issues of constitutional concern, but are simply issues dealing with the appraisal, listing, or assessment of property. As such, they

were properly before the Property Tax Commission, and it is not necessary for us to review the constitutional questions Philip Morris raises in its cross-appeal.

We hold the agreement between Cabarrus County and TMA to be void as against public policy. The Property Tax Commission did not err when it held that the contract itself was null and void as was the discovery that resulted from the contract.

Affirmed.

Chief Judge HEDRICK and Judge WYNN concur.