IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-80

No. 311A20

Filed 13 August 2021

IN THE MATTER OF THE APPEAL OF: HARRIS TEETER, LLC from the decision of the Mecklenburg County Board of Equalization and Review

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 271 N.C. App. 589 (2020), affirming a Final Decision entered on 30 May 2019 by the North Carolina Property Tax Commission. Heard in the Supreme Court on 27 April 2021.

*John A. Cocklereece, Justin M. Hardy, and Kyle F. Heuser for appellant-taxpayer Harris Teeter, LLC.*

*Ruff Bond Cobb Wade & Bethune, LLP, by Ronald L. Gibson and Robert S. Adden, Jr., for appellee Mecklenburg County.*

ERVIN, Justice.

¶ 1 This case requires consideration of the extent to which the Court of Appeals erred by holding that an assessment that Mecklenburg County made of the business personal property owned by Harris Teeter, LLC, at six grocery stores reflected the "true value" of that property as required by N.C.G.S. § 105-283, which defines "true value" as the price "at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used." After careful consideration of

the record in light of the applicable law, we conclude that the Court of Appeals' decision should be affirmed.

¶ 2    In 2015, Mecklenburg County completed an ad valorem tax assessment of Harris Teeter's business personal property, with the property in question having included shelving, coolers, freezers, point-of-sale systems, computers and computer equipment, forklifts, trash compactors, and other items used in the operation of six of the Harris Teeter grocery stores located in Mecklenburg County.[1]  Although the County assessed the value of the business personal property utilized at the six stores at $21,434,313.00, Harris Teeter contended that the "true value" of the property in question was only $13,663,000.00.  As a result, Harris Teeter noted an appeal from the County's tax assessment to the North Carolina Property Tax Commission.  On 5 March 2019, the Commission, sitting as the State Board of Equalization and Review, conducted a hearing concerning Harris Teeter's appeal.

¶ 3    At the hearing, Kenneth Joyner, a tax assessor employed by Mecklenburg County who had worked on the initial assessment of the value of the relevant property, testified that, in order to generate this initial valuation, the County had identified the appropriate cost indices and depreciation schedules and utilized

---

[1] In advance of the hearing that was held before the Commission, the parties stipulated that they would limit their evidentiary presentations to property located at the six stores that the County had previously assessed given that the stores in question were representative of the other stores that Harris Teeter operated in Mecklenburg County.

computer software to apply those indices and schedules to the original cost of Harris Teeter's property. Mr. Joyner testified that, in performing this analysis, the County adhered to North Carolina Department of Revenue schedules and did not include any depreciation-related allowances for obsolescence or consider any other market value-related information. Mr. Joyner acknowledged that the North Carolina Department of Revenue advised that the relevant schedules had "been prepared [ ] as a general guide to be used in the valuation of business personal property" and that there "may be situations where the appraiser will need to make adjustments for additional or less functional or economic obsolescence or for other factors."

¶ 4        Mitchell Rolnick, a machinery and equipment appraiser, testified on behalf of Harris Teeter. Mr. Rolnick stated that he had completed a separate appraisal of the subject property at Harris Teeter's request using market value-based depreciation schedules developed by Landmapp, a private appraisal company, in order to determine the true value of the property in question. The depreciation schedules developed by Landmapp rested upon information concerning sales of used equipment that were primarily made on eBay or other similar e-commerce websites. Mr. Rolnick testified that he took the original cost of the equipment, "index[ed] it to today's dollar," and applied Landmapp's depreciation schedules "to come to the fair market value installed." Mr. Rolnick refrained from including additional depreciation based upon considerations relating to functional or economic obsolescence on the theory that

such factors were captured in the prices reflected in the underlying market transactions. Although Mr. Rolnick agreed that the Department of Revenue's schedules would capture physical deterioration, he believed that the marketplace was "the only place you're going to find" functional and economic obsolescence, which explained why Landmapp had used the prices resulting from market transactions in developing its depreciation schedules. Mr Rolnick acknowledged that, in general, used grocery store equipment either went "to liquidation or [ ] in the dumpster" at the end of its useful life.

¶ 5        According to Mr. Rolnick, in completing his appraisal, he and his colleagues had conducted a physical inventory of the property located at the six stores that were at issue in this case and then searched the Landmapp database, along with information available in other publications and on the internet, for the purpose of identifying sales of comparable property. Mr. Rolnick stated that he did not utilize a "sales comparison" approach given that "significant amounts of adjustments would need to be made" in order to make it viable, but that he used a "market-derived cost approach," in which he compared the price obtained for the property in question in the marketplace to the price of the same piece of equipment when purchased new, given that this approach "took less adjustments to be credible."

¶ 6        James Turner, the president of a business appraisal company, provided rebuttal testimony for the County. After conducting an appraisal of the relevant

property, Mr. Turner concluded that the property had a "true value" of $22,100,000.00.  In order to reach this result, Mr. Turner went to the relevant grocery stores, photographed the equipment that was located at those facilities, and collected information about the equipment from the store managers.  Mr. Turner used depreciation tables developed by Marshall & Swift to account for the physical deterioration of the equipment, indexed the cost of the equipment using the Producer Price Index, and developed values for the equipment using (1) the cost approach; (2) the market, or "comparable sales," approach; and (3) the income approach.

¶ 7        Mr. Turner testified that he had been able to use the market, or "comparable sales," approach to appraise the value of some of the equipment, such as shopping carts and forklifts, given that such items were relatively mobile, self-contained, and occasionally re-sold on an individual basis.  Mr. Turner testified that, on the other hand, larger items of equipment, such as refrigerated cases, coolers, and shelving, were "tethered to the rack compressor system" and had to operate using the same refrigerant, resulting in the existence of higher installation costs and fewer incidences of re-sale that served to make the market approach "less reliable" in valuing these items.

¶ 8        In describing his use of the cost approach, Mr. Turner testified that he used Marshall & Swift valuation tables to account for physical deterioration and for functional obsolescence relating to certain computers, point-of-sale systems, and

other computing equipment. Mr. Turner used the income approach to determine whether an additional adjustment needed to be made as the result of economic obsolescence and found that "the subject stores return[ed] a rate of return on their assets and on equity that [we]re above industry standards" and that the available information concerning the Harris Teeter stores "reflected a robust return on invested capital." In view of the fact that the return that Harris Teeter earned on the subject property was "above industry norms," Mr. Turner concluded that the "equipment didn't suffer any external obsolescence," i.e. economic obsolescence.[2] After stating that he had not "consider[ed] [Harris Teeter's] earnings when [he] was valuing the equipment independently," Mr. Turner acknowledged that he "did use [Harris Teeter's] earnings to determine whether or not there was economic obsolescence within the cost approach."

¶ 9        On 12 March 2019, the Commission entered an order in which it requested that both parties provide written answers to several questions, including the extent to which delivery and installation costs "are or are not an appropriate component of true value" and the "degree [to which] obsolescence is reflected in your opinion of value, and the dollar value attributed to any such obsolescence." In responding to the

---

[2] In explaining the concept of economic obsolescence, Mr. Turner stated that, when NAFTA was adopted, the textile industry had experienced economic obsolescence because many companies moved offshore and income in the industry was much lower than had been expected.

Commission's question regarding delivery and installation costs, Harris Teeter cited to a manual concerning "Personal Property Appraisal and Assessment" that had been published by the North Carolina Department of Revenue in 2007.

¶ 10 On 30 May 2019, the Commission entered a Final Decision affirming the County's initial assessed valuation. The Commission noted that both parties had used the cost approach to generate values for the subject property by determining the "original installed costs for each item of the subject property" and adjusting those costs "to reach an estimate of true value as of January 1, 2015." According to the Commission, the principal explanation for the varying valuation amounts provided by the parties stemmed from differing cost adjustment and depreciation methodologies. In addressing these methodological issues, the Commission found that Mr. Rolnick "had relied upon the sales of used equipment, without making any adjustments," to calculate depreciation, despite the fact that he had "abandoned the sales comparison approach" for the purpose of valuing the relevant property in light of the significant adjustments that would be necessary in order to utilize such an approach. The Commission described Mr. Rolnick's approach as "illogical" given that, on the one hand, he "determine[d] that sales [were] too unreliable to be useful in developing value using the sales comparison approach" while, on the other hand, he used "the same or similar" sales values "under the cost approach to determine the appropriate level of depreciation to apply." In addition, the Commission determined

that Harris Teeter's proposed valuation method did not adequately account for delivery and installation costs on the theory that, "[i]f the basis for determining true value under the cost approach is the total cost required to put equipment to its intended use, then a resale of used equipment must also include installation and other necessary costs."

¶ 11 The Commission rejected Harris Teeter's argument that the County's valuation methodology inappropriately failed to account for functional and economic obsolescence on the grounds that the County had adequately addressed this subject. After noting that there were three types of depreciation, including (1) physical depreciation; (2) functional obsolescence, which consisted of "the decline in an object's value due to outdated or flawed design"; and (3) economic obsolescence, which consisted of "the decline in an object's value due to external economic forces," the Commission found that the County had adequately accounted for physical deterioration, with "all or nearly all of the depreciation affecting the subject property [having been] the result of physical deterioration." In addition, the Commission found that, while "some assets exhibit[ed] functional obsolescence," the County had accounted for this sort of obsolescence in its valuation methodology and that Harris Teeter had "effectively limited the impact of functional obsolescence on its equipment through a program of regularly replacing it." Finally, with respect to the issue of economic obsolescence, the Commission found that the "evidence [did not tend to

show] that [Harris Teeter] is itself closing stores as a result of economic conditions." In addressing both functional and economic obsolescence, the Commission stated that:

> 15. Mr. Turner testified that he identified additional functional obsolescence in computer-based equipment and further depreciated the value of those assets in order to account for the additional loss in value. He testified that he accelerated the depreciation on certain types of equipment as a result of information he received from the Appellant's staff—that some equipment was replaced before the end of its normal useful life because of severe use of that equipment. . . . Mr. Turner testified further that he had personally developed income-based values in order to determine for himself whether the subject property was producing an appropriate return for the Appellant, and determined that the subject property produced income greater than standard for the industry. His conclusion, therefore, is that the subject property does not exhibit economic obsolescence, and we agree. The property's apparent capacity to generate income greater than the industry standard is not an indication of economic obsolescence.

After finding that the County had correctly refrained from adjusting the value of the relevant property to account for economic obsolescence and that the County had properly accounted for physical depreciation and functional obsolescence in its assessment, the Commission concluded that the County's tax valuation was "a reasonable estimate of true value" for the subject property and that, even though Harris Teeter had successfully rebutted the County's initial showing of correctness by offering evidence tending to show that the County's initial valuation exceeded the

"true value" of the relevant property, the County had satisfied its ultimate burden of proving that its appraisal reflected the "true value" of the property. Harris Teeter noted an appeal from the Commission's Final Decision to the Court of Appeals.

¶ 12    In seeking relief from the Commission's Final Decision before the Court of Appeals, Harris Teeter argued that: (1) the Commission had erred by failing to find that the market for used grocery store equipment could be used to identify obsolescence given that market results "necessarily provide[ ] valuable evidence of economic and functional obsolescence"; (2) the Commission had erred by affirming the County's valuation of the relevant property based upon the value of its use by the taxpayer rather than its "fair market value," which is the "price at which the property would likely change hands between a willing buyer and a willing seller," citing *In re Parkdale Mills*, 225 N.C. App. 713, 720 (2013); and (3) the Commission had erred by concluding that the County had demonstrated that its assessment reflected the "true value" of the relevant property. In rejecting Harris Teeter's challenge to the Commission's order, the Court of Appeals began by holding that Harris Teeter had successfully rebutted the presumption of validity to which the County's initial appraisal was entitled by presenting competent evidence that the methodology used to develop the County's initial appraisal methods did not result in the "true value" of the relevant property. *In re Harris Teeter, LLC*, 271 N.C. App. 589, 601 (2020). In addition, the Court of Appeals held that the Commission's findings had sufficient

evidentiary support and that those findings established that the County had satisfied its obligation to prove that the methods that it had employed in valuing Harris Teeter's property produced the "true value" of that property. *Id.* In reaching this result, the Court of Appeals noted that, while both the County and Harris Teeter had used the cost approach to determine the value of the relevant property, "the parties disagree[d] concerning the degree to which functional and economic obsolescence should be considered and used to further adjust appraisal values for additional depreciation" of the property. *Id.* at 602.

¶ 13   The Court of Appeals determined that the cost approach could properly be utilized to determine the value of business personal property based upon a determination of the initial cost of that property reduced by an allowance for depreciation. *Id.* at 601–02. According to the Court of Appeals, "[d]epreciation may be caused by deterioration, which is a physical impairment, such as structural defects, or by obsolescence, which is an impairment of desirability or usefulness brought about by changes in design standards (*functional obsolescence*) or factors external to the property (*economic obsolescence*)." *Id.* at 602 (citing *In re Stroh Brewery*, 116 N.C. App. 178, 186 (1994)). In addition, the Court of Appeals defined "functional obsolescence" as "a loss in value due to impairment of functional capacity inherent in the property itself including factors such as overcapacity, inadequacy or changes in state of the art, or poor design." *Id.* at 603 (citing *In re Westmoreland-LG*

*& E Partners*, 174 N.C. App. 692, 699 (2005)). In evaluating whether the Commission had correctly found that the County appropriately considered the issue of functional obsolescence, the Court of Appeals noted that Mr. Turner had "identified additional functional obsolescence in computer-based equipment" and made an appropriate adjustment in light of the degree of functional obsolescence that he had observed and that he had also "accelerated the depreciation on certain types of equipment as a result of information he received . . . that some equipment was replaced before the end of its normal useful life because of severe use of that equipment." *Id*. In addition, the Court of Appeals pointed out that the Commission had "f[ou]nd no evidence in the record to suggest that the equipment in question (collectively) is failing to perform adequately the job for which it was intended due to design or economic factors." As a result, the Court of Appeals held that the Commission did not err in determining that the County had properly accounted for functional obsolescence. *Id*. at 604.

¶ 14        Similarly, the Court of Appeals held that the "Commission's findings [relating to economic obsolescence] were supported by competent evidence and adequately address[ed] why consideration of the market for used grocery store equipment was inappropriate and did not warrant [the making of an] additional downward adjustment" in determining the "true value" of the relevant property. *Id*. at 605. The Court of Appeals held that the Commission had appropriately determined that the market prices paid for used grocery store equipment were not adequate indicators of

economic obsolescence given that, "due to the prevailing industry trend of store closures flooding the supply in the secondary market for used equipment, the prices fetched by such sales do not represent transactions from 'willing sellers' of the equipment as mandated by N.C.[G.S.] § 105-283." *Id*. at 606. In addition, the Court of Appeals held that Harris Teeter's approach of "assum[ing] that each piece of equipment is due for replacement and headed to either the landfill or the glutted secondary market at the moment it is valued" was erroneous and that the adoption of this assumption "would result in its equipment experiencing a drastic reduction in value the moment they are purchased new and installed in its stores." *Id*. As a result, the Court of Appeals affirmed the Commission's order.

¶ 15        In a separate opinion concurring in the result, in part, and dissenting, in part, Judge Tyson expressed disagreement with the Court of Appeals' determination that the County had successfully established that the appraisal methodologies that it had used established the "true value" of the relevant property as required by N.C.G.S. § 105-283. *Id*. at 609. According to Judge Tyson, the valuation adopted by the County's valuation was "substantially greater" than that proposed by Harris Teeter and "substantially exceed[ed] true value." *Id*. at 613–14. In support of this assertion, Judge Tyson pointed to Mr. Rolnick's testimony that "low market prices for used grocery store equipment necessitated downward adjustment of any values estimated by depreciation schedules to reflect additional economic and functional obsolescence"

and asserted that this portion of the evidence had not been "disputed nor rebutted by the County." *Id*. at 616. As a result, Judge Tyson concluded that, since neither the County nor Mr. Turner had properly accounted for economic and functional obsolescence, the Commission's conclusions were "arbitrary, unlawful, and . . . wholly inconsistent with long-established definitions, precedents, and attributes governing personal property." *Id*.

¶ 16        In seeking to persuade us to overturn the Court of Appeals' decision, Harris Teeter argues that, after it had demonstrated that the County's valuation was unreasonably high and shifted the burden of proof with respect to the "true value" issue to the County, the County had failed to prove that its appraisal methods resulted in the establishment of the "true value" of the relevant property and had not, for that reason, satisfied the applicable burden of proof. More specifically, Harris Teeter argues that the valuation procedures utilized by the County failed to establish the "true value" of the relevant property because those methods did not properly account for functional and economic obsolescence. Harris Teeter claims to have elicited substantial evidence concerning "economic conditions that put significant downward pressure on the fair market value of used grocery store equipment" and that this evidence indicated that the relevant property was subject to both functional and economic obsolescence. In support of this proposition, Harris Teeter notes that, "in 2013 and 2014, there were 5,500 mergers and acquisitions of grocery stores in the

United States and 869 bankruptcies and closures" and points out that Harris Teeter "and its competitors remodel their stores — on average, every six to seven years — as they compete for consumers," with both of these developments having flooded the market for used grocery store equipment. In Harris Teeter's view, "[t]his glut of used grocery store equipment *inevitably* affects the fair market value of the Property," with the County having failed to assess the property at issue in this case at its "true value" given its failure to account for this functional and economic obsolescence.

¶ 17      In addition, Harris Teeter directs our attention to *In re IBM Credit Corp.*, 201 N.C. App. 343, 350–51 (2009) (*IMB II*), in which the Court of Appeals reversed a Commission order upholding the manner in which Durham County had assessed the value of business personal property owned by IBM, in part, on the grounds that the Commission's finding that the County had properly considered obsolescence by relying upon a government depreciation schedule was erroneous given the absence of sufficient record support for that finding. According to the Court of Appeals, the County's "failure to make additional depreciation deductions due to functional and economic obsolescence due to market conditions result[ed] in an appraisal which [did] not reflect 'true value.'" *Id.* At 354. Harris Teeter contends that, in this case, as in *IBM II*, the County simply failed to "produce a valid explanation for its failure to make the required adjustments, only producing appraisals that do not rebut [Harris

Teeter]'s evidence of significant economic and functional obsolescence affecting the Property."

¶ 18     Secondly, Harris Teeter argues that the Court of Appeals incorrectly interpreted the relevant statutory language, which provides that:

> All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

N.C.G.S. § 105-283 (2019). In Harris Teeter's view, the value of the relevant property for property tax valuation purposes should rest upon the price of used grocery store equipment, which is, quite literally, the price which a willing buyer would pay for the equipment to a willing seller, with the Court of Appeals' determination that the use of market prices was "inappropriate" for the purpose of determining the "true value" of used grocery store equipment being fundamentally flawed.

¶ 19     In addition, Harris Teeter takes issue with the Court of Appeals' determination that the Commission appropriately considered its favorable economic performance vis-à-vis that of its competitors in determining whether the value of the relevant property should be reduced to account for functional or economic obsolescence. In Harris Teeter's view, the Commission's belief that the property in question "must

have a higher value than other used grocery store equipment because [Harris Teeter] uses it well in its business operations" rests upon its "subjective worth" to the taxpayer, an approach that the Court of Appeals disavowed in *Parkdale Mills*, 225 N.C. App. at 720, by stating that the "Commission's findings implicitly allow the County to measure the value of the properties as their subjective worth to" the taxpayer, a standard of valuation that was "obviously not the same as adequately determining the objective value of these properties to another willing buyer." *Id.* (citing *In re AMP, Inc.*, 287 N.C. 547, 568 (1975)).

¶ 20        The County, on the other hand, argues that the Court of Appeals correctly held that the Commission's findings of fact had sufficient record support and provided ample justification for the Commission's conclusions of law. The County claims to have presented evidence tending to show that its initial valuation captured the "true value" of the relevant property, with this evidence including the appraisal completed by Mr. Turner, who reduced his estimate of the value of some of Harris Teeter's computer-related property based upon a finding of functional obsolescence and failed to find any evidence that any of the relevant property was economically obsolete given that Harris Teeter achieved above-average income using the relevant property.

¶ 21        According to the County, the Court of Appeals correctly upheld the Commission's decision to reject the arguments advanced on Harris Teeter's behalf in Mr. Rolnick's testimony. The County contends that the Court of Appeals was not

entitled to "re-weigh the evidence presented and substitute its evaluation for the Commission's," which is what, in the County's view, Harris Teeter was seeking to have it do. Instead, the County asserts that the issue for the Court of Appeals and this Court on appellate review is "whether an administrative decision has a rational basis in the evidence," citing *In re McElwee*, 304 N.C. 68, 87 (1981). In arguing that the Commission had a rational basis in the evidence for its decision, the County directs our attention to Mr. Turner's use of the cost approach, the manner in which he depreciated certain items of property, and the income-based values that Mr. Turner used in determining whether a further deduction for economic obsolescence would be appropriate. As a result, for all of these reasons, the County urges us to affirm the Court of Appeals' decision.

¶ 22    In evaluating whether the Commission "properly accepted [the] County's method of valuing [a taxpayer's property] rather than the method offered by [the] taxpayer, we use the whole-record test to evaluate the conflicting evidence." *In re Greens of Pine Glen Ltd.*, 356 N.C. 642, 647 (2003). As we have consistently noted,

> it is the function of the administrative agency to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. We cannot substitute our judgment for that of the agency when the evidence is conflicting. However, when evidence is conflicting, as here, the standard for judicial review of administrative decisions in North Carolina is that of the "whole record" test. . . . The whole record test is not a tool of judicial intrusion; instead, it

> merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence.

*In re McElwee*, 304 N.C. at 87 (cleaned up). In conducting "whole record" review, we are required to "evaluate the conflicting evidence" and determine "whether the Commission properly accepted [the] County's method of valuing" the property rather than that proffered by the taxpayer. *In re Greens of Pine Glen Ltd.*, 356 N.C. at 647. The "whole record" test does not, of course, allow a reviewing court to "replace the Commission's judgment with its own judgment even if there are two reasonably conflicting views; rather, [the reviewing court] merely determine[s] whether an administrative decision has a rational basis in evidence." *In re Westmoreland*, 174 N.C. App. at 697 (citing *In re Perry-Griffin Found.*, 108 N.C. App. 383, 393 (1993)). For that reason, the reviewing court simply "evaluate[s] whether the Commission's decision is supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Comr. of Ins. v. Rating Bureau*, 292 N.C. 70, 80 (1977)) (cleaned up).

¶ 23   According to N.C.G.S. § 105-283, business personal property must be appraised for property taxation purposes at its "true value in money," defined, as has already been noted, as the property's "market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller." According to well-established North Carolina law,

when interpreting a statute, "undefined words are accorded their plain meaning so long as it is reasonable to do so." *Polaroid Corp. v. Offerman,* 349 N.C. 290, 297 (1998). As a result, the statutory description of "true value" and the manner in which it is defined should be interpreted in accordance with the ordinary meaning of the relevant terms, a fact that clearly suggests the appropriateness of ordinary valuation methods in determining the "true value" of the relevant property.

¶ 24        "[A]d valorem tax assessments are presumed to be correct"; when "such assessments are attacked or challenged, the burden of proof is on the taxpayer to show that the assessment was erroneous." *In re AMP, Inc.*, 287 N.C. at 562. In order to rebut this presumption of correctness, the taxpayer must "produce 'competent, material and substantial' evidence that tends to show that: (1) Either the county tax supervisor used an arbitrary method of valuation; or (2) the county tax supervisor used an illegal method of valuation; AND (3) the assessment substantially exceeded the true value in money of the property." *Id*. at 563. "An illegal appraisal method is one which will not result in 'true value' as that term is used in [N.C.G.S.] § [105-]283." *In re S. Ry. Co.*, 313 N.C. 177, 181 (1985). In order to show that the County's initial assessment "substantially exceeded the true value in money of the property," the taxpayer must show that "the valuation was unreasonably high." *In re AMP,* 287 N.C. at 563. In the event that the taxpayer satisfies its initial burden of proving that the County's valuation was unreasonably high, the County is then required to

"demonstrate [ ] that the values determined in the revaluation process were not substantially higher than that called for by the statutory formula" and "demonstrate the reasonableness of its valuation 'by competent, material and substantial evidence.'" *In re McElwee*, 304 N.C. at 86–87 (citation omitted); *see also In re Parkdale Mills*, 225 N.C. App. at 717 (holding that, "[o]nce the taxpayer rebuts the initial presumption, the burden shifts back to the County which must then demonstrate that its methods produce true values").

The record reflects that both Harris Teeter and the County utilized the cost approach in order to appraise the relevant property.[3]  The cost approach "is the most effective methodology for the appraisal of personal property."  North Carolina Dept. of Revenue Ad Valorem Tax Division, *2007 Personal Property Appraisal and Assessment Manual Section VIII:  The Appraisal of Business Personal Property*, 14 (2007) [hereinafter *NCDOR Manual Section VIII*].[4]  Given that business personal

---

[3] As the record clearly reflects, neither party argued before the Commission or before this Court that the Commission was required to value the relevant business personal property on the exclusive basis of the prices charged for such property in the secondary market.  Instead, the only purpose for which Harris Teeter proposed the use of secondary market prices was to determine the extent, if any, to which the original cost of the property should be reduced for economic obsolescence.

[4] A portion of this manual was included in Harris Teeter's response to an Order of the Commission and in the record developed before the Court of Appeals.  The manual can be found at:  https://www.ncdor.gov/documents/2007-personal-property-appraisal-and-assessment-manual-section-viii-appraisal-business-personal.  In view of the fact that this manual reflects the ordinary meaning of the statutory definition of "true value" set out in N.C.G.S. §105-283, it is appropriate for this Court to consider that document, upon which Harris Teeter relied before the Commission and the Court of Appeals, in evaluating the validity of the order that is before us in this case.

property, such as machinery and equipment, is "not traded regularly in the market" and that it is rare for "business taxpayers [to] purchase new equipment merely to update to the latest model available," "the cost (accounting method) approach is the recommended method for the valuation of business personal property." *Id.* An analyst should account for depreciation in utilizing the cost approach by

> estimating the current cost of a new asset, then deducting for various elements of depreciation, including physical deterioration and functional and external obsolescence to arrive at "depreciated cost new." The "cost" may be either reproduction or replacement cost. The logic behind this method is that an indication of value of the asset is its cost (reproduction or replacement) less a charge against various forms of obsolescence such as functional, technological and economic as well as physical deterioration if any.

*IBM II*, 201 N.C. App. at 351. "Depreciation may be caused by deterioration, which is a physical impairment such as structural defects, or by obsolescence, which is an impairment of desirability or usefulness brought about by changes in design standards (*functional obsolescence*) or factors external to the property (*economic obsolescence*)." *In re Stroh Brewery*, 116 N.C. App. at 186 (cleaned up). In view of the fact that Harris Teeter does not appear to contend that the Commission failed to properly address the issue of physical impairment, we will focus the remainder of our analysis upon issues surrounding functional and economic obsolescence.

¶ 26        As a definitional matter, functional obsolescence is "a loss in value due to impairment of functional capacity . . . inherent in the property itself" stemming from

factors such as "overcapacity, inadequacy or changes in state of the art, or poor design." *In re Westmoreland*, 174 N.C. App. at 699 (citing North Carolina Dept. of Revenue Ad Valorem Tax Division, *Business Personal Property Appraisal Manual*, 7–17 (1995)). In *Westmoreland*, the Court of Appeals found that the property under consideration in that case did not exhibit any signs of functional obsolescence in light of the fact that, at least in part, the relevant electric generating facilities had "outstanding performance records, operate[d] above industry standards in production, ha[d] no environmental problems, and ha[d] been consistently profitable" for the taxpayer. *Id*. at 699–700.

¶ 27        Similarly, economic obsolescence accounts for the change in the value of the relevant property that "results from economic forces, such as legislative enactments or changes in supply and demand relationships," *NCDOR Manual Section VIII*, 17, with such obsolescence being caused by "adverse influences arising from causes external to the machinery and equipment" such as social and legislative changes, general economic changes, considerations of supply and demand, and changes in prices and profitability. *Id*. at 19–20. "The most common causes of economic obsolescence in machinery and equipment are the changes in market demand for products being manufactured by the equipment and also the general economic conditions that are present." *Id*. at 30. Ordinarily, economic depreciation is estimated using either the "comparable sales" method, in which the analyst examines

market sales of similar equipment, or by capitalizing income losses, *id.*, with the

Commission having essentially adopted the second of these two approaches in this

case. As the Department of Revenue has stated:

> The shortage of current market data in comparable sales has caused appraisers to search for other ways to quantify economic obsolescence in machinery and equipment. Market data often does not represent true value transactions . . . . Most equipment in the used equipment market is there because of liquidation, bankruptcy or other causes which could very well influence the sales price of the equipment. . . . It should be noted that many of the sales transactions on used equipment will not reflect true market value and as such, are not appropriate for ad valorem tax valuations.
>
> As has been stated, machinery and equipment derives its value from its ability to generate a normal, profitable income to its owners during the expected useful life of the equipment. When the market demand for a product drops, causing income to be less than normal, the value of the equipment is affected.
>
> If market demand for a product drops, the degree to which the lack of product demand affects the value of the equipment (or the economic obsolescence), can be calculated by analyzing the current operating statements of the business and comparing them to expected statements at normal demand levels.

*Id.* As a result, the generally accepted methods for determining whether an

adjustment for economic obsolescence should be made include an evaluation of the

relative profitability of the specific business whose property is being valued, a fact

that justifies a focus upon the profitability of that business. However, in spite of this

admonition to avoid using the "comparable sales" method in instances in which it fails to reflect "true market value" of the relevant property and the Commission's apparent decision to accept this logic in its order, Harris Teeter argues that the Court of Appeals erred by taking its favorable economic performance into consideration in upholding the Commission's "true value" determination and contends that the evidence concerning the prices for used grocery store equipment in the secondary market necessitates an additional depreciation-related adjustment for economic obsolescence.[5]

¶ 28     The issue before the Court in this case is not a new one. In *AMP*, this Court examined the lawfulness of the Commission's decision to uphold the manner in which Guilford County valued the portion of an electronics manufacturer's business personal property that consisted of in-process inventory and raw materials. 287 N.C. at 555, 559. Although the taxpayer offered evidence tending to show that its raw materials were "so unique" that it got "nothing but scrap [metal] for them," so that the "raw materials and in-process inventories had a true value in money equivalent to their scrap value," which was "how much cash could be derived from the sale of the subjects, that is the underlying materials, that are available for sale if they should be

---

[5] Although Harris Teeter mentions the issue of functional obsolescence in its brief, its legal attack upon the Commission's order focuses upon the issue of economic obsolescence and fails to explicitly explain how the Commission erred in the course of addressing the issue of functional obsolescence. As a result, the discussion contained in the remainder of this opinion will focus upon the Commission's treatment of the issue of economic obsolescence.

sold at that date in their present state," *id*. at 556–57, we rejected that argument, stating that the taxpayer's

> theory that the only value its inventories had was scrap value . . . [was] based on the assumption, obviously fictional, that on 1 January of each year it is required to sell all of its inventory, whether such inventory is in raw material or in an in-process state, to the only possible buyers of such materials, the scrap mills.

*Id*. at 567–68.  As a result, we held that (1) the true value of "true scrap metal," which consisted of materials that could not be used to create electronics and simply had to be discarded, equaled the prices for which such items could be sold in the scrap metal market; (2) the true value of "non-defective in-process inventory," which consisted of incomplete, in-process electronics that would, upon completion, be sold to consumers, equaled "the cost of replacing the inventory, plus labor and overhead"; and (3) the true value of "non-damaged, raw material inventory," which consisted of undamaged brass and copper coils that could be converted into electronics for subsequent sale to consumers, equaled "the cost of replacing such inventory on the critical date."  *Id*. at 569–75.

In affirming the Commission's determination that non-defective in-process inventory should not be appraised using the market price of scrap metal, we pointed out that "the record is totally devoid of any evidence that AMP 'usually' and 'freely' sold such materials back to its suppliers for scrap prices" and that "the evidence is that AMP NEVER made such sales."  *Id*. at 570.  In addition, we noted that "it would

be ridiculous" to sell in-process inventory for scrap and that "no on-going business entity would adopt such a sales plan," which would result in the receipt of substantially less money for such property than the property would bring as a finished product. *Id.* After acknowledging that the record tended to show that there was no direct market for in-process inventories or raw materials, we stated that "the mere fact that there is no market for a particular property does not deprive it of 'market value,' [or] 'true value,'" and that "[m]arket value can be constructed of elements other than sales in the market place." *Id.* at 571. For that reason, we concluded that it would be appropriate to utilize valuation principles derived from cases involving damaged personal property and the valuation of stock in order to determine the "true value" of in-process inventory and raw materials. *Id.* at 572–73.

¶ 30     After reaching this conclusion, the Court went on to compare the value of the taxpayer's in-process inventory to the measure of damages associated with the loss of personal property for which there was no market, stating that:

> Cost of replacement or repair, with suitable adjustments for the fact that the damaged or destroyed property was old and had depreciated in value, is perhaps, as previously noted, the most commonly considered factor in fixing value of personal property that has no market. The usual formula employed for determining the value of the destroyed property in such cases deducts the accrued depreciation on the damaged property from the replacement costs.

*Id.* at 572 (citations omitted). As a result, the Court essentially approved the use of "replacement cost less depreciation" in order to value the taxpayer's in-process inventory rather than requiring the use of the market prices available for the relevant materials in the scrap metal market.

¶ 31        On the other hand, in *IBM II*, the Court of Appeals reviewed the Commission's decision to uphold the manner in which Durham County assessed the taxpayer's business personal property, including certain computers and computer equipment, and held that the county's initial assessment did not produce "true value." 201 N.C. App. 343. In order to determine the "true value" of the relevant property, Durham County had determined the original cost of the property in question and then adjusted it using a schedule that had been prepared by the Department of Revenue. *Id.* at 344. In spite of the fact that the Department of Revenue had cautioned that "the schedules [were] only a guide" and that appraisers might "need to make adjustments for additional functional or economic obsolescence," Durham County simply applied the numbers derived from the schedule to the original cost of the relevant items of property without doing anything more. *Id.* at 344–45. In upholding the validity of the taxpayer's assertion that the appraisal method that Durham County utilized in the instance before it in that case did "not produce a 'true value' or 'fair market value' for its equipment, because the schedule [did] not properly account for functional or economic obsolescence present in the 2001 computer and computer equipment

market," *id*. at 347, the Court of Appeals concluded that the Commission had failed to "adequately track[ ] the detailed burden-shifting analysis required by" the relevant case law or to "adequately address key issues necessary to arrive at the ultimate decision" that it was required to make, which was "[w]hat is the market value of the property being appraised," resulting "in conclusions which lack evidentiary support and are therefore arbitrary and capricious." *Id*. at 349 (citing N.C.G.S. § 105-283).

¶ 32          A careful examination of the logic adopted by this Court in *AMP* and by the Court of Appeals in *IBM II* suggests that, on the one hand, the Commission does not err by rejecting a method for determining "true value" that places exclusive, or even principal, reliance upon market sales and is, instead, entitled to consider the extent to which prices revealed by sales in particular markets are abnormally low or high as the result of external factors. For that reason, Harris Teeter's implicit argument that market sales should be deemed controlling in the context of determining "true value" was squarely rejected by this Court in *AMP*. On the other hand, the Court of Appeals correctly held in *IBM II* that "true value" cannot be properly determined by mechanically applying generic schedules without making sure that those schedules fairly and accurately reflect the conditions that the taxpayer actually faces. As a result, the ultimate lesson to be learned from *AMP* and *IBM II* is that there is no single required method for determining "true value" and that a proper "true value"

determination must rest upon a careful analysis of all relevant factors. In our opinion, the Commission did exactly that in this instance.

¶ 33     The ultimate issue that confronts us in this case is whether the Commission's findings and conclusions have a "rational basis in the evidence," *In re McElwee*, 304 N.C. at 87, or whether they are "supported by substantial evidence," *In re Westmoreland*, 174 N.C. App. at 697, and whether those findings support the Commission's ultimate determination with respect to the issue of true value. In concluding that the County had made the necessary evidentiary showing, the Commission placed principal reliance upon the testimony provided by Mr. Turner, who stated that he had utilized the cost approach, the market, or "comparable sales," approach, and the income approach in valuing the relevant used grocery store equipment; that he had been able to use the market approach to value some of the more mobile and self-contained items, such as shopping carts and forklifts; that most of the larger items, such as refrigerated cases and coolers, had high delivery and installation costs and utilized the same refrigerant system; that these factors made the use of the market approach to value these items of property unreliable; and that he had used the "cost method" to value the remaining items. As we have already noted, the Commission also found that

> 15.  Mr. Turner testified that he identified additional functional obsolescence in computer-based equipment and further depreciated the value of those assets in order to account for the additional loss in value. He

> testified that he accelerated the depreciation on certain types of equipment as a result of information he received from the Appellant's staff—that some equipment was replaced before the end of its normal useful life because of severe use of that equipment. . . . Mr. Turner testified further that he had personally developed income-based values in order to determine for himself whether the subject property was producing an appropriate return for the Appellant, and determined that the subject property produced income greater than standard for the industry. His conclusion, therefore, is that the subject property does not exhibit economic obsolescence, and we agree. The property's apparent capacity to generate income greater than the industry standard is not an indication of economic obsolescence.

Based upon these findings, the Commission concluded that "the county's value of $21,434,313 is not only supported by Mr. Turner's appraisal, but also is a reasonable estimate of true value." In other words, the Commission treated the issue of the extent to which an adjustment should be made to the original cost of Harris Teeter's property for economic obsolescence as a question of fact to be determined on the basis of the record evidence and reached a result that even our dissenting colleagues appear to concede has sufficient support in the record evidence. As a result, after carefully examining the record, we hold that the Commission's findings with respect to the issue of functional and economic obsolescence, which rely upon Mr. Turner's testimony that, with certain limited exceptions, he did not detect the presence of functional obsolescence and that his evaluation of Harris Teeter's economic performance precluded the need for an adjustment for economic obsolescence, have

sufficient evidentiary support and support the Commission's conclusion that the County satisfied its obligation to rebut Harris Teeter's challenge to the validity of its appraisal methodologies.

¶ 34     We do not find Harris Teeter's contentions that the low prices of used grocery store equipment in the secondary market require the making of a further adjustment for economic obsolescence and that the Commission erred by relying upon Harris Teeter's favorable economic performance in concluding that such economic obsolescence did not exist to be persuasive.  Such an argument assumes that, as a matter of law, there is one, and only one, way to calculate economic obsolescence in spite of the fact that the relevant statutory language contemplates the use of generally accepted valuation principles and the fact that the approach that the Commission adopted for use in this case is fully consistent with both generally accepted valuation principles and the accounting and economic evidence in the record.  For that reason, we believe that acceptance of Harris Teeter's argument would be inconsistent with the relevant statutory language and require us to engage in an impermissible exercise of appellate factfinding.

¶ 35     In addition, we believe that Harris Teeter's arguments rest upon an erroneous understanding of the nature of economic obsolescence.  As we have previously demonstrated, economic obsolescence stems from the effects of economic conditions external to the property under consideration, such as social and legislative changes,

current economic conditions, the taxpayer's ability to use the property to make a profit, and similar factors. According to the Department of Revenue, market prices "often do[ ] not represent true value transactions" given that "[m]ost equipment in the used equipment market is there because of liquidation, bankruptcy or other causes," which drastically reduces the equipment's market price. *NCDOR Manual Section VIII*, 30. In such instances, "sales transactions on used equipment will not reflect true market value and as such, are not appropriate for ad valorem tax valuations." *Id.*

¶ 36        As Mr. Rolnick admitted in his testimony before the Commission, Harris Teeter's used grocery store equipment goes "to liquidation or . . . the dumpster" at the end of its useful life. Our review of the record does not provide any basis for believing that the used grocery store equipment at issue in this case had reached the end of its useful life. In addition, Mr. Rolnick acknowledged that the market for used grocery store equipment had been flooded with such property, a fact that greatly reduced the prices that were being received in that market. In light of this set of facts, which appear to be undisputed, the record clearly supports the Commission's determination that the prices received for the sales of comparable items of used grocery store equipment in the secondary marketplace upon which Mr. Rolnick relied did not provide reliable evidence of economic obsolescence and certainly does not compel a conclusion to the contrary. As in *AMP*, the record here "is totally devoid of any

evidence that [the taxpayer] 'usually' and 'freely' [bought or] sold such" used equipment in the marketplace and did not require the Commission to value the used equipment at its secondary market price. 287 N.C. at 570.

¶ 37 Moreover, the Department of Revenue has determined that "analyzing the current operating statements of the business and comparing them to expected statements at normal demand levels" is an appropriate way to determine if the business' property is economically obsolescent, with an additional depreciation adjustment for economic obsolescence being appropriate in the event that the return that the business is earning is lower than one would otherwise expect. *NCDOR Manual Section VIII*, 30. The testimony provided by Mr. Turner tends to show that the equipment used in Harris Teeter's grocery stores generated "a rate of return on their assets and on equity" that was "above industry standards," with this being the sort of evidence that is ordinarily considered in determining whether an adjustment of economic obsolescence needs to be made. As a result, the record contains ample justification for the Commission's decision to consider the profitability of Harris Teeter's stores in determining whether an additional adjustment for economic obsolescence would be appropriate, given that the value of business personal property "derives its value from its ability to generate a normal, profitable income to its owners during [its] useful life," *NCDOR Manual Section VIII*, 30, and that no such adjustment needed to be made in this instance.

¶ 38         Although Harris Teeter argues that, in this case, "[a]s in *IBM II*, the County failed to produce a valid explanation for its failure to make the required adjustments" for depreciation due to functional and economic obsolescence and that, as was the case in *IBM II*, "[t]he failure to make additional depreciation deductions due to functional and economic obsolescence due to market conditions results in an appraisal which does not reflect 'true value,'" 201 N.C. App. at 354 (2009), we have no hesitation in concluding that the record in this case appears to be markedly different from the one that was before the Court of Appeals in *IBM II*. As we understand *IBM II*, the County applied a governmentally developed schedule to the original cost of the relevant property without making any additional adjustments despite the fact that the schedule upon which the County relied stated that the analyst might "need to make adjustments for additional functional or economic obsolescence" and that the Commission, rather than engaging in the burden-shifting analysis required by *AMP*, simply asserted that the County had met its "burden." In this case, on the other hand, the testimony of Mr. Turner, which tended to show that he made significant adjustments to the cost of certain items of Harris Teeter's property and that he had fully considered the extent to which additional adjustments needed to be made to appropriately account for functional and economic obsolescence, constituted substantial evidence that he appropriately considered both functional and economic obsolescence in his appraisal, an analysis which is fully reflected in the

Commission's findings and conclusions. Although the record does, of course, contain evidence that would have supported a contrary conclusion, the Commission, rather than this Court, has the fact-finding responsibility in this case. In other words, rather than being an issue of law, we conclude that the issue before the Commission in this case was one of fact, which the Commission resolved in a manner that had ample record support. As a result, for all of these reasons, we hold that none of Harris Teeter's challenges to the Commission's order have any merit and that the Court of Appeals' decision to uphold its lawfulness should be affirmed.[6]

AFFIRMED.

---

[6] Harris Teeter did not argue before this Court that the Commission used a non-uniform method for valuing its property, N.C. Const. art. V, §2(2) (2(2), or violated any other tax-related constitutional provision, *see Harris v. Harris,* 307 N.C. 684, 690 (1983) (stating that, "[w]hen a party fails to raise an appealable issue, the appellate court will generally not raise it for that party") (citing *Henderson v. Matthews*, 290 N.C. 87 (1976)); *Crockett v. First Fed. Sav. & Loan Ass'n of Charlotte*, 289 N.C. 620, 632 (1976) (stating that, in accordance with N.C.R. App. P. 28, "appellate review is limited to the arguments upon which the parties rely in their briefs"), and there does not appear to be any evidence that the Commission failed to apply the valuation principles used in this case to other taxpayers or to utilize the same justification for refusing to make an adjustment for economic obsolescence in other cases.

Justice BERGER dissenting.

I fully join in Justice Barringer's dissent but write separately because "[a] frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35.

> The admonition of the Constitution requiring frequent recurrence to fundamental principles is politically sound. . . . We violate no precedent in referring to the important function these guaranties of personal liberty perform in determining the form and character of our Government. . . . If those whose duty it is to uphold tradition falter in the task, these guaranties may be defeated temporarily, or permanently lost through obsolescence.

*State v. Harris*, 216 N.C. 746, 762–63, 6 S.E.2d 854, 865–66 (1940).

The non-uniform valuation method employed by the government and sanctioned by the majority is constitutionally suspect and detrimental to economic liberty. *See* N.C. Const. article V, § 2(2) ("No class of property shall be taxed *except by uniform rule*, and every classification shall be made by general law *uniformly* applicable[.]" (emphasis added)); article I, § 1 ("We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, *the enjoyment of the fruits of their own labor*, and the pursuit of happiness." (emphasis added)); and article I, § 19 ("No person shall be . . . in any manner deprived of his life, liberty, or property, but

by the law of the land. No person shall be denied the equal protection of the laws[.]").

¶ 41 As noted in Justice Barringer's dissent, imposition of a "success tax" is problematic. The "uniform appraisal" of the subject property's "true value" should be based on fair market value, i.e., "the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller[.]" N.C.G.S. § 105-283 (2019). The valuation method employed by Harris Teeter's expert relied on information derived from sales of used equipment on eBay and other existing markets – exactly the circumstances contemplated by the statute. This statutorily acceptable valuation method produced an appraised "true value" of $13,663,000.00.

¶ 42 In contrast, the valuation method employed by the government bore little resemblance to the statutorily prescribed method. The government's expert testified that, rather than consulting prices derived from sales of similar equipment in existing markets, he "use[d] [Harris Teeter's] earnings to determine whether or not there was economic obsolescence[.]" The government's expert determined that Harris Teeter's "rate of return on the assets[,]" which was "above industry norms," supported his conclusion that the "equipment didn't suffer any external obsolescence[.]" In other words, because the government deemed Harris Teeter to be a successful company, the government determined they must be treated differently.

¶ 43 Here, the government created an artificial valuation of the subject property. As a result, this non-uniform, statutorily unacceptable valuation method produced an appraised value of $22,100,000.00 – more than $8,000,000.00 higher than the value produced by Harris Teeter's expert. The valuation method employed by the government ignores existing markets for used business equipment, creates an artificial market for said equipment to exact additional monies from taxpayers, and treats taxpayers differently based solely on profitability. The fact that a practice may be widespread does not make it constitutionally permissible. Here, the government deprives Harris Teeter of property in the form of profits through use of a valuation method that appears inconsistent with our State Constitution.

¶ 44 " 'All taxes on property in this State for the purpose of raising revenue are imposed under the rule of uniformity.' " *Hajoca Corp. v. Clayton*, 277 N.C. 560, 567–68, 178 S.E.2d 481, 486 (1971) (quoting *Roach v. Durham*, 204 N.C. 587, 591, 169 S.E. 149, 151 (1933)); *see also* N.C. Const. article V, § 2(2). "The fundamental right to property is as old as our state. . . . From the very beginnings of our republic we have jealously guarded against the governmental taking of property." *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852–53, 786 S.E.2d 919, 923–24 (2016) (citing John Locke, *Two Treatises of Government* 295 (London, Whitmore & Fenn et al. 1821) (1689) ("The great and chief end, therefore, of men's uniting into commonwealths, and putting

themselves under government, is the preservation of their property.").

¶ 45        "This Court's duty to protect fundamental rights includes preventing arbitrary government actions that interfere with the right to the fruits of one's own labor." *King v. Town of Chapel Hill*, 367 N.C. 400, 408, 758 S.E.2d 364, 371 (2014) (citing N.C. Const. art. I, § 1). The "fundamental guaranties" of Article I, section 1, which include the guarantee to the fruits of one's own labor, are "very broad in scope." *State v. Ballance*, 229 N.C. 764, 769, 51 S.E.2d 731, 734 (1949).

> The fundamental purpose for [the Declaration of Rights'] adoption was to provide citizens with protection from the State's encroachment upon these rights. Encroachment by the State is, of course, accomplished by the acts of individuals who are clothed with the authority of the State. . . . We give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens in regard to both person and property.

*Corum v. University of North Carolina*, 330 N.C. 761, 782–83, 413 S.E.2d 276, 290 (1992) (citations omitted).

¶ 46        The case sub judice presents an even more compelling argument for a violation of Article I, section 1 than in the recently decided case of *Tully v. City of Wilmington*, 370 N.C. 527, 810 S.E.2d 208 (2018). In *Tully*, this Court held that to state a proper claim grounded in Article I, section 1, a public employee must establish: "(1) a clear, established rule or policy existed regarding the employment promotional process that

furthered a legitimate governmental interest; (2) the employer violated that policy; and (3) the plaintiff was injured a result of that violation." *Id.* at 537, 810 S.E.2d at 216.

¶ 47        We are concerned here, not with an "established rule or policy[,]" but rather with fundamental rights guaranteed by our Constitution and a plainly worded statutory provision. *See* N.C. Const. article V, § 2(2); article I, § 19; and N.C.G.S. § 105-283 (setting forth the "*[u]niform appraisal standards*" of "*[a]ll* property, real and personal." (emphasis added)). The violation of these fundamental rights by the government has deprived Harris Teeter of their profits, i.e., the fruits of their labor.

¶ 48        Beyond the immediate impact on Harris Teeter, this valuation method will curtail economic liberty and produce inconsistent and undesirable results for businesses in this State. Any business that earns a "rate of return on the[ir] assets" which is "above industry norms" risks the government effectuating an extra-statutory taking of the fruits of their labor, and this Court should decline to sanction such action. *See King*, 367 N.C. at 408, 758 S.E.2d at 371 ("This Court's duty to protect fundamental rights includes preventing arbitrary government actions that interfere with the right to the fruits of one's own labor.").

¶ 49        I respectfully dissent.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting

opinion.

Justice BARRINGER, dissenting.

I join Justice Berger's dissent, but nonetheless write separately to specifically address the errors of the North Carolina Property Tax Commission.

## I.  Prologue

**"A tax is a fine for doing well, a fine is a tax for doing wrong ."**

**Mark Twain**

In this matter, the North Carolina Property Tax Commission without any statutory or pertinent legal authority, and perhaps inadvertently but nonetheless inexorably, effectively imposes a "success tax" under which the taxpayer's economic success relative to applicable industry standards subjects it to higher business personal property valuations and thus higher property tax liabilities. This is not sound tax policy nor law. It conflicts with the uniform appraisal standard established by our constitution and by statute requiring that all personal property "shall as far as practicable be appraised or valued at its true value in money." N.C.G.S. § 105-283 (2019). The profitability or revenue production of a successful taxpayer should not and, under constitutional and statutory principles, cannot impose higher valuation and property tax payments vis-à-vis a less successful taxpayer.

## II. Background

In this matter, the Commission concluded that the taxpayer had "offered competent, material, and substantial evidence that the County's value of the subject property substantially exceeded the true value of the subject properties, when the

[taxpayer] produced evidence tending to show that the true value of the subject properties was actually about one-third (1/3) less than the County's value, according to an appraisal developed by its expert witness." Nevertheless, the Commission ultimately though circuitously concluded that "[t]he County demonstrated that its methods in appraising the subject property produced true values when it provided evidence that the true values of the subject property, considering all forms of depreciation, was consistent with the County's values for the subject property." Not surprisingly, the County's evidence—its expert's appraised valuation—are consistent with the County's previously assessed values.

¶ 53        Both parties generated value opinions for the subject property based on the cost approach, beginning with the original installed costs for each item of the subject property, and then made adjustments to the cost. Where the value opinions diverge occurs in the consideration of "[t]he effect of obsolescence on the property," N.C.G.S. § 105-317.1(a). The taxpayer's appraisal apparently found obsolescence for all the subject property due to the current rampant and competitive nature of the grocery store industry's need to upfit every six to seven years.

¶ 54        The taxpayer's expert relied on depreciation tables compiled from data concerning sales of used equipment and concluded that the difference between the equipment new and used as reflected in the table calculations is the amount of physical depreciation and obsolescence for the property. Essentially, the taxpayer's position and testimony of its expert were that true value in money is the actual

market value for the used property and pointed to the economic factors of high supply from store closures, mergers, and remodeling and minimal demand due to fewer store openings.

¶ 55      On the other hand, the County's expert deducted physical depreciation and tested for obsolescence. He employed the income approach to test for economic obsolescence. Because he found that the rate of return for the subject property exceeded the standard for the industry, he concluded that the subject property did not exhibit economic obsolescence. The County's expert also testified that from his research, most companies in the industry with the ability to buy do not buy in the secondary market. Thus, in his opinion, the market for used equipment is for a buyer who buys everything at once as a continuing operation. Based on any layman's definition of supply and demand, fewer buyers in a used equipment market buying in large quantities should produce LOWER prices and thus LOWER "true values." The Commission agreed with the County's expert, concluding that "[t]he property's apparent capacity to generate income greater than the industry standard is not an indication of economic obsolescence."

### III.     Analysis

¶ 56      While the Commission's finding appears to be in accord with the tax and accounting standards for identifying economic obsolescence, *see* Connor J. Thurman & Robert F. Reilly, *What Tax Lawyers Need to Know about the Measurement of Functional and Economic Obsolescence in the Industrial or Commercial Property*

*Valuation (Part 1)*, 35 Prac. Tax Law. 11, 16–18 (2020), allowing or disallowing an adjustment to a cost approach valuation on account of the rate of return for personal property conflicts with the design of a uniform appraisal standard requiring that all personal property "shall as far as practicable be appraised or valued at its true value in money." N.C.G.S. § 105-283.

¶ 57 Decisions of the Commission are reviewed by this Court pursuant to N.C.G.S. § 105-345.2. N.C.G.S. § 105-345.2 (2019). "Questions of law receive *de novo* review, while issues such as sufficiency of the evidence to support the Commission's decision are reviewed under the whole-record test." *In re Greens of Pine Glen Ltd.*, 356 N.C. 642, 647 (2003) (citing N.C.G.S. § 105-345.2(b)). The issue here—whether a taxpayer's relative economic success is determinative of economic obsolescence for a valuation of business personal property—is a question of law.

¶ 58 Section 105-283 of the General Statutes of North Carolina requires uniformity in appraisals for property taxation. N.C.G.S. § 105-283. Specifically,

> [a]ll property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

N.C.G.S. § 105-283.

¶ 59    Thus, a valuation of property at true value in money does not consider who owns the property. *See* N.C.G.S. § 105-283. Rather, it is the valuation in money from a hypothetical transaction in a perfect market—the exchange "between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used." N.C.G.S. § 105-283.

¶ 60    Economic obsolescence "is a reduction in the value of the property due to the effects, events, or conditions that are external to—and not controlled by—the current operation or condition of the taxpayer's property." Connor J. Thurman & Robert F. Reilly, *What Tax Lawyers Need to Know about the Measurement of Functional and Economic Obsolescence in the Industrial or Commercial Property Valuation (Part 1)*, 35 Prac. Tax Law. 11, 13 (2020); *see also Obsolescence, Black's Law Dictionary* (11th ed. 2019) (defining "economic obsolescence" as "[o]bsolescence that results from external economic factors, such as decreased demand or changed governmental regulations"). Given the definitive requirement of an external cause, economic obsolescence is unrelated to who owns the property, and logically, the amount of revenue or net profits generated by the owner of that property is not determinative of economic obsolescence.

¶ 61    Therefore, the fact that a specific taxpayer's rate of return on the subject property *exceeds industry standards* does not refute the existence of economic obsolescence, and certainly does not justify per se higher "true values." Economic

obsolescence has an external cause and an immutable internal impact, but it will not necessarily result in underperformance relative to industry peers. *Cf. In re Colonial Pipeline Co.*, 318 N.C. 224, 229, 233–235 (1986) (finding no error in Commission's approval of the Department of Revenue's refusal to deduct from valuation opinion for true value an amount attributable to economic obsolescence where taxpayer's expert adjusted valuation by 25.36% on the grounds that investors were demanding a rate of return in the market of 14% for similar investments but taxpayer's rate of return was limited to 10.45% by Federal Energy Regulatory Commission).

¶ 62        Accordingly, the Commission's conclusion to this effect, while supported by the County's expert's testimony, reflects an error of law, necessitating remand to the Commission for further proceedings pursuant to N.C.G.S. § 105-345.2(b)(4). *See* N.C.G.S. § 105-345.2(b)(4) (providing reversal, remand, or modification of a Commission's order when the "Commission's findings, inferences, conclusions or decisions are . . . [a]ffected by other errors of law"). The Commission ignored the statutory mandate for true value in money required by N.C.G.S. § 105-283 when assessing the existence and arguable impact of economic obsolescence.

¶ 63        The majority overlooks this fundamental error of law. They raise that the County's expert did consider obsolescence, did make some adjustments for obsolescence, and did testify as to his assessment. They riddle their opinion with quotes from the North Carolina Department of Revenue 2007 Personal Property Appraisal and Assessment Manual. Yet, neither a manual issued by the North

Carolina Department of Revenue nor the County's expert's testimony is law. *Cf. Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 260 (2016) (giving only "due consideration" to the manner in which the Secretary of Revenue has interpreted the statutory language at issue in a published bulletin because the construction adopted by those who execute and administer the law is only persuasive); *In re IBM Credit Corp.*, 201 N.C. App. 343, 353 (2009) (rejecting county's argument that the schedule employed is legal and used by all 100 counties because to do so would render tax appeals limited to "determining whether or not the proper government schedule was employed" rather than applying the burden shifting analysis required by our precedent). Thus, when the testimony or publications conflict with N.C.G.S. § 105-283, it is this Court's duty to remand due to a fundamental error in law.

## IV.    Epilogue

As Judge Learned Hand of our Federal Second Circuit opined many decades ago: "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935) (quoted in *United States v. Carlton*, 512 U.S. 26, 36 (1994) (O'Connor, J. concurring)).

Later, Judge Hand expanded this principle in his dissent in *Commissioner of Internal Revenue v. Newman,* 159 F.2d 848 (1947) by observing: "Over and over again

courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant." *Id.* at 850–51 (Hand, J., dissenting).

I respectfully dissent.

Chief Justice NEWBY and Justice BERGER join in this dissenting opinion.